MARK E. BERGHAUSEN (S.B. #278968)
mberghausen@omm.com
O'MELVENY & MYERS LLP
2765 Sand Hill Road
Menlo Park, California 94025-7019
Telephone: (650) 473-2600
Facsimile: (650) 473-2601

Attorneys for Plaintiff
LocusPoint Networks, LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LocusPoint Networks, LLC, a Delaware Limited Liability Company, <br><br> Plaintiff, <br><br> v. <br><br> D.T.V. LLC, a Wyoming Limited Liability Company, <br><br> Defendant. | Case No. _____ <br><br> **COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff LocusPoint Networks, LLC ("LPN"), by and through its undersigned counsel, O'Melveny & Myers LLP, for its complaint against Defendant D.T.V. LLC ("DTV"), respectfully alleges, upon knowledge as to its own actions and information and belief as to others' actions, as follows:

**NATURE OF ACTION**

1.     This is an action to enforce an asset purchase agreement that DTV has tried to terminate after its own contractual breaches prevented an essential closing condition from occurring.

2.     DTV owns and operates WPHA-CD, a broadcast television station in Philadelphia that holds a valuable Class A license from the Federal Communications Commission

1  ("FCC"). In an October 26, 2012 Asset Purchase Agreement ("APA," a true and correct copy of
2  which is attached as Exhibit A), DTV contracted to sell certain WPHA assets, including the Class
3  A license, to LPN for $6.4 million.

4         3.        Assigning a Class A license to another party requires the FCC's prior
5  consent, which the FCC does not grant for licenses that have not been granted a current renewal.
6  Because WPHA's most recent renewal application had not been granted, LPN sought assurances
7  from DTV about the validity of the WPHA license, and the parties drafted several contractual
8  provisions to facilitate—and attempt to expedite—the FCC's consent to the parties' Class A
9  license assignment application.

10         4.        First, LPN sought to ensure that WPHA's Class A license was not
11  encumbered by any pending FCC complaints, investigations, or violations. Accordingly, DTV
12  represented, among other things, that (i) WPHA "has been at all times during the current license
13  term . . . operating in compliance with the terms and conditions of the FCC Licenses" and FCC
14  "rules, regulations and policies"; (ii) DTV had "not received any notice asserting any
15  noncompliance with any applicable statute, rule or regulation, in connection with the operation of
16  the Station"; and (iii) DTV knew of no such pending or threatened investigations or "any basis
17  for" one.

18         5.        Second, DTV committed, among other things, to "use [its] best efforts to
19  obtain the FCC Consent as soon as practicable," such as by "promptly provid[ing] all information
20  and documents requested by the FCC" and "cooperat[ing] fully with [LPN] in taking any
21  commercially reasonable actions" to close the transaction.

22         6.        Relying on DTV's representations and its commitment to move quickly to
23  obtain the FCC's consent to the assignment application, LPN agreed to a provision allowing
24  either party to terminate the APA on or after September 1, 2013, if the transaction had not closed.

25         7.        In February 2013, approximately three months after the APA's execution,
26  LPN learned that DTV's representations about WPHA's compliance record were false. As early
27  as April 2007, DTV knew that it had not allowed an FCC field agent access to inspect WPHA's
28  main studio, as the FCC required. In fact, the FCC's Enforcement Bureau had issued a Letter of

Inquiry to DTV on June 15, 2007, regarding WPHA's noncompliance with the FCC's rules regarding main studio operations. The pattern continued when the field agent was again unable to gain access in August and September 2011. DTV was aware of each of these instances but disclosed none of this to LPN when it executed the APA.

8. DTV then breached its APA obligations by, among other things, failing to "promptly provide all information and documents" to the FCC to resolve the FCC Enforcement Bureau's investigation into the field agent's reports, which has delayed the FCC's renewal of WPHA's license and its consent to the assignment application. Instead, DTV responded to LPN's repeated suggestions and update requests by offering one excuse after another, ranging from an inability to learn "details" to spotty Internet service to simply being tired.

9. When DTV finally got around to submitting a memorandum to the FCC on May 23, 2013—more than three months after LPN first learned of the investigation into the field agent's reports—it barely addressed the critical question of whether WPHA had improperly denied the field agent access to inspect the main studio. Not surprisingly, DTV's incomplete submission failed to resolve the FCC's concerns.

10. In the meantime, DTV's improper motive for orchestrating its delay became clear—it hoped to run out the clock on the APA so it could sell WPHA's appreciating Class A license elsewhere at a higher price. DTV's sole member, Randolph Weigner, all but admitted as much when he wrote to LPN on June 11, 2013, that he wanted to "explore other options" at an upcoming FCC auction in which Class A licensees would have an opportunity to receive payment for relinquishing their FCC-granted spectrum-usage rights.

11. DTV's scheme to escape its contractual obligations had its intended effect. DTV avoided filing any substantive response squarely addressing the FCC Enforcement Bureau investigation until August 15, 2013—less than three weeks before the APA's September 1 termination-option date. The Enforcement Bureau was unable to resolve its investigation into WPHA by September 1.

12. Although DTV's own delay was to blame, DTV refused to execute an APA amendment extending the termination-option date. Rather, DTV stated that it was evaluating

whether to pursue the upcoming FCC auction instead of closing the APA. On March 11, 2014, DTV sent a termination notice to LPN in an attempt to carry out its intent to prevent the agreed sale of WPHA's Class A license to LPN.

13. DTV's exercise of the termination option—indeed, the very notion of a September 1, 2013 termination-option date—is the product of its own contractual breaches, which have prevented LPN from completing its purchase of the assets that DTV agreed to sell it. LPN seeks to remedy DTV's breaches through specific performance, as the APA provides, or in the alternative monetary damages in an amount to be proven at trial.

**PARTIES**

14. LPN is a Delaware limited liability company with its principal place of business in Pleasanton, California.

15. DTV is a Wyoming limited liability company with its principal place of business in South Carolina. DTV owns and operates WPHA-CD, a television station in Philadelphia, Pennsylvania. DTV's sole member is Randolph Weigner, a South Carolina resident.

**JURISDICTION AND VENUE**

16. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(2) because (i) the amount in controversy exceeds $75,000.00; and (ii) LPN is a citizen of Delaware and California, and DTV is a citizen of Wyoming and South Carolina.

17. This Court has personal jurisdiction over the parties, and venue is proper in this district under 28 U.S.C. § 1391(d), because LPN negotiated and entered the APA in this District.

**INTRADISTRICT ASSIGNMENT**

18. Assignment to the San Francisco or Oakland Division of this Court pursuant to Civil Local Rule 3-2 is proper because LPN negotiated and entered the APA in Alameda County.

# FACTS

**DTV Contracts to Sell WPHA's Assets to LPN
and to Work Diligently to Obtain FCC Consent**

19. DTV owns WPHA-CD, a television broadcast station in Philadelphia, Pennsylvania, that holds a Class A broadcast license from the FCC.

20. On October 26, 2012, DTV and LPN executed the APA, a true and correct copy of which is attached as Exhibit A, under which DTV agreed to sell certain WPHA assets, including the station's Class A broadcast license, to LPN for $6.4 million.

21. An assignment of a broadcast license cannot legally take effect unless and until the FCC consents to the assignment. Thus, APA Article 4 provided that the WPHA asset sale would close within ten business days after the FCC's "grant of its consent to assignment of the FCC Licenses to [LPN]." Similarly, Sections 10.2 and 11.2 listed the FCC's consent to the assignment as a condition to the APA's closing.

22. Because of these closing conditions, the APA imposed on DTV the obligation to cooperate and work diligently in obtaining the FCC's consent. Section 5.1 committed the parties to "diligently prosecute" the assignment application "and otherwise use their best efforts to obtain the FCC Consent as soon as practicable." Section 5.2 further required the parties to "cooperate with the FCC in connection with obtaining the FCC Consent," and to "promptly provide all information and documents requested by the FCC in connection therewith."

23. DTV also agreed to cooperate with LPN in obtaining the FCC's consent to the assignment. APA Section 9.1 obligated the parties to "cooperate fully with [each] other in taking any commercially reasonable actions (including to obtain the required consent of any governmental instrumentality or any third party) necessary to accomplish the transactions contemplated by this Agreement, including, but not limited to, the prompt satisfaction of any condition to the Closing set forth herein."

**DTV Represents That WPHA Is Not Subject
to Any FCC Inquiries or Investigations**

24. Given the necessity of obtaining the FCC's consent to the assignment to complete the transaction, LPN wanted to ensure that WPHA (i) was not the subject of any FCC complaints or investigations that could jeopardize that consent, and (ii) had fully complied with all FCC rules. Such representations from DTV were vital to the transaction because the FCC would not consent to the assignment if WPHA were the subject of an unresolved FCC complaint or rule violation.

25. DTV provided those representations. It represented in APA Section 7.4(b), for example, that "[t]o the knowledge of [DTV], there are no complaints or proceedings pending or threatened before the FCC relating to the operation of the Station, other than proceedings affecting the broadcasting industry generally."

26. In addition, under APA Section 7.4(c), DTV represented that WPHA was "operating in compliance with the terms and conditions of the FCC Licenses, the Communications Act and the current rules, regulations and policies of the FCC applicable to the Station in all material respects."

27. Similarly, under APA Section 7.8, DTV represented that it "has not received any notice asserting any noncompliance with any applicable statute, rule or regulation, in connection with the operation of the Station, and, to [DTV's] knowledge, no investigation is pending or threatened regarding any such matter."

28. And in APA Section 7.10, DTV represented that "[t]here are no . . . legal proceedings, claims or governmental investigations pending against, or, to [DTV's] knowledge, threatened against, [DTV] relating to or affecting this Agreement or the transactions contemplated hereby or the Station Assets, nor, to Seller's knowledge, is there any basis for any such . . . legal proceeding, claim or governmental investigation."

29. Complementing DTV's guarantees as of the APA execution date was DTV's covenant to maintain WPHA's Class A license until the APA's closing. In Section 8.1(c), DTV covenanted to "take all commercially reasonable actions necessary to maintain the Station's Class A status."

30. These representations and covenants induced LPN to agree to the termination-option date that DTV requested if the transaction were not to close. Section 15.1(e) allowed either party to terminate the APA on written notice "on or after September 1, 2013," approximately ten months after the APA's October 26, 2012 execution, "if the Closing shall not have been consummated on or before the date of such notice."

31. LPN would not have agreed to allow termination as early as September 1, 2013, without DTV's assurances that (i) WPHA was operating in compliance with FCC rules and policies and was not subject to any current or threatened FCC complaints or investigations, and (ii) DTV would maintain the station's Class A status and work diligently to obtain the FCC's consent to the assignment.

**The FCC's Ongoing Inquiry into WPHA's Refusals
to Grant Access to an FCC Field Agent Demonstrates
That DTV's APA Representations Were False When Made**

32. DTV breached its representations that WPHA (i) was not the subject of any pending or threatened investigation, and (ii) was in full compliance with all FCC rules. Rather, WPHA was the subject of an ongoing FCC Enforcement Bureau inquiry when DTV signed the APA on October 26, 2012. Although DTV knew of this inquiry dating back at least to 2007, it did not disclose the inquiry to LPN when it entered the APA.

33. At a February 7, 2013 meeting with the Chief of the FCC Media Bureau's Video Division—more than three months after the APA's execution—LPN learned for the first time that an FCC Enforcement Bureau field agent, attempting to conduct an inspection of WPHA, had been blocked from entering the station's main studio facility in Philadelphia, in apparent violation of both Section 73.1225 of the FCC's rules, which requires each broadcast licensee to "make the station available for inspection by representatives of the FCC," and the policies underlying Section 73.1125 of the FCC rules (47 C.F.R. §73.1125) (the "Main Studio Rule"), which require that a station's main studio be accessible.

34. DTV knew of, but did not disclose to LPN when it executed the APA, the agent's failed attempts to inspect the station. DTV's counsel admitted in an August 15, 2013 memorandum to the FCC that the agent had inspected WPHA's main studio facility on December

7, 2006, and that subsequent e-mail correspondence showed that the agent (i) left four or five phone messages with station personnel in April 2007 regarding a follow-up inspection, (ii) followed those messages with an e-mail, and (iii) attempted to contact DTV's sole member, Randolph Weigner.

35. These events caused the FCC to issue a Letter of Inquiry to DTV on June 15, 2007, the existence of which DTV also did not disclose to LPN when it executed the APA.

36. The field agent was again denied access to inspect WPHA's main studio facility on August 17 and September 30, 2011—more than a year before DTV executed the APA. The agent tried to contact both the station's local manager and Weigner. DTV responded not by offering the field agent access to inspect the station, as FCC rules require, but by offering instead to answer questions in writing or by phone. DTV disclosed none of this to LPN when it executed the APA.

37. On information and belief, such a brazen denial of access—let alone *repeated* denials of access—to an FCC field agent to inspect a station are extremely rare. On information and belief, DTV's actions caused the FCC to begin a thorough investigation that involved senior FCC personnel, delaying the FCC's required consent to the assignment.

38. The field agent's thwarted inspection attempts and resulting FCC inquiry demonstrate that DTV breached its APA representations (i) in Section 7.4(b) that "there are no complaints or proceedings pending or threatened before the FCC relating to the operation of the Station"; (ii) in Section 7.4(c) that WPHA "has been at all times . . . operating in compliance with the terms and conditions of the FCC licenses, the Communications Act and the current rules, regulations and policies of the FCC"; (iii) in Section 7.8 that it had "not received any notice asserting any noncompliance with any applicable statute, rule or regulation, in connection with the operation of the Station" and knew of no such pending or threatened investigations; and (iv) in Section 7.10 that there were "no . . . legal proceedings, claims or governmental investigations pending against, or, to [DTV's] knowledge, threatened against, [DTV] relating to or affecting . . . the Station Assets, nor, to [DTV's] knowledge, is there any basis for any such . . . legal proceeding, claim or governmental investigation."

**DTV Breaches the APA by Delaying and Failing to Address WPHA's Refusal to Grant Access to the FCC Field Agent**

39. At the February 7, 2013 meeting, the FCC's Media Bureau invited DTV to submit information to address the FCC's concerns about WPHA's noncompliance with the FCC's rules. LPN encouraged DTV to heed the FCC's instructions immediately, consistent with DTV's obligations under the APA to (i) "diligently prosecute" the assignment application, (ii) "use [its] best efforts to obtain the FCC Consent as soon as practicable," (iii) "cooperate with the FCC in connection with obtaining the FCC Consent," (iv) "promptly provide all information and documents requested by the FCC," and (v) "cooperate fully with [LPN] in taking any commercially reasonable actions (including to obtain the required consent of any governmental instrumentality or any third party) necessary to" close the APA. (Ex. A §§ 5.1, 5.2, 9.1.)

40. DTV breached its APA obligations by delaying its response to the FCC and refusing to address the field agent's complaints until August 15, 2013—more than six months after the February 7 meeting with the FCC Media Bureau and, conveniently, less than three weeks before the APA's September 1 termination-option date.

41. At least since February 7, 2013, DTV has frustrated the Class A license assignment application by prolonging the FCC inquiry so DTV could run out the clock on the APA. DTV made its intention to scuttle the transaction clear on February 11, 2013, just four days after the February 7 meeting with the FCC Media Bureau, when it suggested that it "may be time to withdraw from the deal."

42. DTV offered a litany of excuses for delaying its response to the FCC. On February 14, 2013, DTV's counsel told LPN's counsel that he was trying to learn facts but was dealing with a "difficult client" in DTV.

43. LPN continued to press DTV to respond. On March 7, 2013, LPN reiterated to DTV's counsel that the best way to resolve the FCC's inquiry was to submit the best facts that DTV could gather to demonstrate WPHA's compliance with FCC rules. DTV's counsel agreed.

44. LPN called DTV's counsel on March 29, 2013—now more than a month and a half since the FCC meeting—to voice LPN's frustration with DTV's delay. LPN again encouraged DTV to submit facts to address the FCC's concerns.

45. LPN's counsel left DTV's counsel another voicemail on April 12, 2013.

46. Each time, DTV responded with an excuse more dubious than the last. These delay excuses included (i) a girlfriend's illness (February 25, 2013); (ii) an inability to learn "details" (March 1, 2013); (iii) other, apparently more important work on other matters (March 13, 2013); (iv) an "e-mail meltdown" (March 21, 2013); (v) having a "cold" and being tired (April 12, 2013); and (vi) a wish for "faster Internet service for research" (May 2, 2013).

47. Nearly three weeks later, on May 21, 2013, DTV still had not completed its research, so LPN stepped in, consistent with its APA obligation to cooperate in obtaining the FCC's consent to the assignment. LPN detailed for DTV five cases to cite to support DTV's arguments to the FCC. But DTV's counsel refused to cite two of those cases; he stated that he was counsel of record and did not want the FCC to resume its investigations of his other clients.

48. When LPN suggested ways to strengthen DTV's FCC submission, DTV refused them. For example, on May 23, 2013, LPN suggested that Weigner, as the sole member of DTV, WPHA's owner, sign a declaration to support the memo's factual assertions. DTV declined.

49. Instead, DTV submitted a memo on May 23 that did not expressly address the FCC's central complaint that WPHA had denied the FCC field agent access to the main studio. Rather, in addition to addressing other issues such as the filing of children's television programming reports, DTV argued only that

> If, and to the extent that, the FCC inspector found the main studio unattended at some times (not at all times), it should be noted that WPHA-CD's main studio has been at locations shared by business enterprises other than the station, and the manager has conducted his/her other business at that same location. The demands of the activities of the other enterprise were the reason that WPHA-CD's staff was not always present, a situation not inconsistent with the main studio rule.

50. Pending the FCC's response to this memo, DTV continued to make clear that it hoped to run out the clock and attempt to terminate the APA so it could try to sell WPHA's Class A license at a higher price at an upcoming FCC auction. Weigner wrote to LPN on June 11, 2013, that "Quite honestly we are getting so close to the expected auction date should the contract as written not result in a sale I will have to explore other options."

51. Meanwhile, as DTV delayed the Class A license assignment application, LPN devoted time and resources to removing obstacles to its approval. On June 17, 2013, DTV informed LPN that it had received a complaint from a New Jersey television station, WPSJ, that Philadelphia-based WPHA was operating in WPSJ's channel 38 airspace in violation of a 2012 FCC Settlement Agreement. After DTV stated that it would "rather not spend the money," LPN voluntarily paid for new equipment that allowed WPHA to shift its transmissions to channel 24, thereby complying with the FCC Settlement Agreement and helping to resolve WPSJ's interference complaint.

52. In response to DTV's May 23, 2013 memo, the FCC Media Bureau issued on July 11, 2013, a Notice of Apparent Liability in the amount of $9,000 for DTV's violation of an FCC rule requiring the timely filing of children's television programming reports. This Media Bureau action did not address any other compliance issues, and did not resolve the FCC Enforcement Bureau's investigation into the field agent's reports that he was denied access to WPHA's main studio.

53. On July 26, 2013, the FCC Enforcement Bureau offered DTV (through its counsel) another opportunity to present facts that would explain or otherwise justify its refusal to grant the field agent access to the WPHA main studio.

54. When DTV had not responded by August 5, 2013, LPN asked DTV to (i) extend the September 1, 2013 termination-option date, and (ii) submit additional facts to the Enforcement Bureau. DTV declined both. When LPN's counsel asked why DTV would not extend the termination-option date, DTV's counsel said DTV had not authorized him to discuss the subject.

55. In response to an inquiry from LPN on August 7, 2013, DTV stated that rather than submitting facts to the FCC to rebut the field agent's reports, DTV intended merely to perform "research to show that failure to permit inspection has been tolerated" by the FCC in the past.

56. And DTV continued to offer excuses and drag its feet in responding to the FCC, as it had done since February 2013. These excuses included (i) being "diverted" by other work (August 8, 2013) and (ii) installing cable at home (August 12, 2013).

57. On August 13, 2013, DTV's counsel reported to LPN's counsel that Weigner was reviewing DTV's draft submission, but DTV's counsel was not sure he would be "satisfied with the additional information [Weigner] gives me" and did not "want to take [Weigner's] word for it." The next day, August 14, DTV's counsel said that Weigner had provided "vague" information about two occasions when the FCC field agent was denied access to WPHA's main studio.

58. On August 15, 2013, DTV submitted its memorandum to the FCC concerning the remedy for WPHA's alleged refusal to grant access to the FCC field agent.

**DTV's Breaches and Delay Enable Its Attempt to Terminate the APA**

59. By the time it submitted its memorandum to the FCC, however, DTV had succeeded in delaying the resolution of the FCC's investigation and approval of the assignment application. True to form, DTV threatened to terminate the APA just four days after submitting its memorandum if the FCC did not approve the assignment application by September 1.

60. Meanwhile, LPN prepared for closing. On August 24, 2013, it (i) finalized and sent the closing documents to DTV, and (ii) waived certain closing conditions. It further agreed not to exercise its termination option if the FCC did not approve the assignment application by September 1, and again asked DTV to execute an APA amendment extending the option date. DTV refused.

61. DTV's plan had its intended effect. On August 28, 2013, the FCC Enforcement Bureau told LPN's counsel that it would not be able to conclude the investigation—

1   and thus the FCC would not able to consent to the assignment application—by September 1, the
2   APA termination-option date.

3       62.    On September 3, 2013, DTV's counsel told LPN that he could not ensure
4   that DTV would close the transaction even if the FCC were to consent to the assignment
5   application. Rather, he stated that DTV was evaluating whether to close the APA or instead
6   pursue the upcoming FCC auction in which it would have the opportunity to receive payment for
7   relinquishing its FCC-granted spectrum-usage rights.

8       63.    By preventing the APA from closing, DTV's breaches—first
9   misrepresenting the absence of any FCC investigations followed by delaying resolution of just
10  such an investigation—had activated DTV's option to terminate the APA.

11      64.    While DTV was deciding whether to wrongfully back out of the APA, LPN
12  expended time and resources on DTV's behalf, meeting and speaking with FCC staff on
13  numerous occasions to urge prompt resolution of the Enforcement Bureau's inquiry to enable the
14  renewal of WPHA's Class A license. Indeed, DTV itself referred to the FCC's communications
15  with LPN and LPN's counsel in DTV's own discussions with the FCC.

16      65.    Apparently unsatisfied with DTV's response, the FCC still had not
17  resolved the Enforcement Bureau inquiry by March 2014. On March 11, 2014, with the FCC
18  auction approaching and having achieved its goal of delaying the assignment application's
19  approval, DTV sent a notice to LPN attempting to terminate the APA.

20      **FIRST CLAIM FOR RELIEF**
    (Breach of Contract)
21

22      66.    LPN repeats and realleges the allegations contained in paragraphs 1
23  through 64 as though fully set forth herein.

24      67.    The APA is a valid and binding contract.

25      68.    LPN fully performed its obligations under the APA.

26      69.    As alleged above, when DTV and LPN executed the APA, the FCC was
27  investigating its field agent's reports that WPHA had denied the agent access to inspect the main
28  studio. These thwarted inspection attempts and resulting investigation rendered false and

1  misleading DTV's APA representations (i) in Section 7.4(b) that "there are no complaints or
2  proceedings pending or threatened before the FCC relating to the operation of the Station"; (ii) in
3  Section 7.4(c) that WPHA "has been at all times . . . operating in compliance with the terms and
4  conditions of the FCC licenses, the Communications Act and the current rules, regulations and
5  policies of the FCC"; (iii) in Section 7.8 that it had "not received any notice asserting any
6  noncompliance with any applicable statute, rule or regulation, in connection with the operation of
7  the Station" and knew of no such pending or threatened investigations; and (iv) in Section 7.10
8  that there were "no . . . legal proceedings, claims or governmental investigations pending against,
9  or, to [DTV's] knowledge, threatened against, [DTV] relating to or affecting . . . the Station
10 Assets, nor, to [DTV's] knowledge, is there any basis for any such . . . legal proceeding, claim or
11 governmental investigation."

12  70.  As alleged above, despite LPN's exhortations to submit a prompt and
13 thorough factual report to the FCC to resolve the investigation and advance the assignment
14 application, DTV delayed responding to the FCC for months. The quantity of its excuses was
15 exceeded only by the transparency of its true motive to run out the clock so it could attempt to
16 back out of the APA after its termination option ripened on September 1, 2013, enabling it to seek
17 a better deal elsewhere. DTV's conduct breached its APA obligations to (i) "diligently
18 prosecute" the assignment application, (ii) "use [its] best efforts to obtain the FCC Consent as
19 soon as practicable," (iii) "cooperate with the FCC in connection with obtaining the FCC
20 Consent," (iv) "promptly provide all information and documents requested by the FCC," and (v)
21 "cooperate fully with [LPN] in taking any commercially reasonable actions (including to obtain
22 the required consent of any governmental instrumentality or any third party) necessary to" close
23 the APA. (Ex. A §§ 5.1, 5.2, 9.1.)

24  71.  DTV's APA breaches prevented the occurrence of a closing condition—the
25 FCC's consent to the assignment application—and enabled DTV to attempt to terminate the APA
26 under Section 15.1(e) on March 11, 2014, thus preventing LPN from purchasing the assets that
27 DTV had contracted to sell it.
28

1         72.     LPN has been damaged as a direct and proximate result of DTV's conduct.

2 It requests specific performance of the APA under Section 15.2(b), which provides that "specific

3 performance or injunctive relief shall be a reasonable and satisfactory" remedy.  Under Section

4 15.2(b),

> [I]n lieu of terminating due to [DTV's] material default, [LPN] may
> . . . bring an action for specific performance or injunctive relief. . . .
> [DTV] acknowledges that the Station is a unique asset that cannot
> be readily replaced on the open market and that [LPN] will be
> irreparably harmed if this Agreement is breached by [DTV].
> Therefore, in the event that [LPN] institutes any action to obtain
> injunction relief or to specifically enforce [DTV's] performance
> under this Agreement, [DTV] agrees to waive the defense that
> [LPN] has an adequate monetary remedy at law and [DTV] shall
> not interpose any opposition, legal or otherwise, as to the propriety
> of specific performance or injunctive relief as a remedy for [LPN].

11         73.     LPN has no adequate remedy at law for DTV's breaches, which facilitated

12 its wrongful attempt to terminate the APA.  LPN is entitled to specific performance to void

13 DTV's attempted termination, prohibit DTV from selling WPHA's assets to another party, and

14 prevent DTV from participating in the FCC spectrum auction.

15         74.     In the alternative, LPN requests monetary damages in an amount to be

16 proven at trial, but in no event less than $75,000, plus interest as allowed by law from the date of

17 DTV's wrongful termination of the APA to the earlier of the date of payment or judgment.

**SECOND CLAIM FOR RELIEF**
**(In the Alternative)**
(Breach of the Implied Covenant of Good Faith and Fair Dealing)

20         75.     LPN repeats and realleges the allegations contained in Paragraphs 1

21 through 64 as though fully set forth herein.

22         76.     LPN pleads this claim in the alternative to its First Claim for Relief.

23         77.     The APA is a valid and binding contract.

24         78.     LPN fully performed its obligations under the APA.

25         79.     DTV breached its obligation to act in good faith in carrying out the terms

26 of the APA by, among other things, (i) concealing the ongoing FCC investigation into WPHA's

27 alleged refusal to grant access to an FCC field agent to inspect WPHA's main studio; (ii) thereby

28 inducing LPN to agree to a September 1, 2013 termination option in the APA; (iii) delaying its

1  response to the FCC to delay the FCC's consent to the WPHA Class A license assignment
2  application, a necessary condition to closing the APA; and (iv) using that delay to trigger and
3  exercise the APA's termination option in the hope of pursuing a better deal elsewhere.  DTV's
4  bad-faith conduct frustrated the purpose of the APA to sell WPHA's Class A license and other
5  assets to LPN.

6  80.  LPN has been damaged as a direct and proximate result of DTV's conduct.
7  It requests specific performance of the APA under Section 15.2(b) or, in the alternative, monetary
8  damages in an amount to be proven at trial, but in no event less than $75,000, plus interest as
9  allowed by law from the date of DTV's wrongful termination of the APA to the earlier of the date
10 of payment or judgment.

**THIRD CLAIM FOR RELIEF**
(Attorneys' Fees Under the APA)

13  81.  LPN repeats and realleges the allegations contained in Paragraphs 1
14 through 79 as though fully set forth herein.

15  82.  The APA is a valid and binding contract.

16  83.  LPN fully performed its obligations under the APA.

17  84.  Section 16.12 of the APA allows the prevailing party to recover its
18 reasonable attorneys' fees and expenses in any litigation to enforce the APA:  "In the event of a
19 dispute relating to this Agreement involving the interpretation or enforcement of the terms of this
20 Agreement, resulting in litigation brought by either party, the prevailing party in such litigation
21 shall be entitled, in addition to other relief ordered by the Court, to reasonable attorneys' fees and
22 expenses."

23  85.  This action involves a dispute relating to the APA and seeks to enforce the
24 APA's terms.  Accordingly, the prevailing party is entitled to recover its reasonable attorneys'
25 fees and expenses incurred in connection with this action.

26  WHEREFORE, Plaintiff LPN seeks judgment against Defendant DTV as follows:
27  A.  Ordering specific performance of the APA, or, in the alternative, awarding
28 LPN damages in an amount to be proven at trial, but in no event less than $75,000;

1         B.      Awarding LPN interest as allowed by law from the date of DTV's

2 wrongful attempt to terminate the APA;

3         C.      Directing DTV to reimburse LPN's legal and other expenses incurred in

4 pursuing this action, in an amount to be determined upon an offer of proof to the Court, and

5 granting LPN leave of the Court to offer a report constituting such proof to the Court; and

6         D.      Awarding LPN such other and further relief as the Court may deem just

7 and proper.

## DEMAND FOR JURY TRIAL

9         86.      Plaintiff hereby demands, pursuant to Federal Rule of Civil Procedure 38, a

10 trial by jury of all issues so triable.

Dated:  March 19, 2014

                                          MARK E. BERGHAUSEN
                                          O'MELVENY & MYERS LLP


                                          By:     /s/ Mark E. Berghausen
                                                      Mark E. Berghausen
                                          Attorneys for Plaintiff
                                          LocusPoint Networks, LLC