UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOCUSPOINT NETWORKS, LLC,<br><br>            Plaintiff,<br><br>    v.<br><br>D.T.V., LLC,<br><br>            Defendant. | Case No. 3:14-cv-01278-JSC<br><br>**ORDER DENYING DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION** |

This breach of contract action arises out of Plaintiff LocusPoint Networks' agreement to purchase a television station in Philadelphia, Pennsylvania from Defendant D.T.V., LLC ("DTV"). DTV contends that this Court lacks personal jurisdiction of it and has moved to dismiss under Federal Rule of Civil Procedure 12(b)(2). After carefully considering the parties' submissions, and having the benefit of oral argument on June 19, 2014, the Court DENIES the Motion to Dismiss. The Court finds that it has specific jurisdiction of DTV as it purposefully availed itself of the privilege of conducting activities in California in connection with the contract at issue in this case.

**FACTUAL BACKGROUND**

Defendant owns and operates the television station WPHA in Philadelphia, Pennsylvania. (Complaint ¶ 2.) In January 2012, Ravi Potharlanka, Plaintiff's President and Co-Founder, contacted Defendant's principal, Randolph Weigner to "request a time to discuss DTV's television station holdings, including WPHA." (Dkt. No. 19-1 ¶ 2.) Mr. Weigner told Mr. Potharlanka that Defendant had the stations listed for sale with Patrick Communications, L.L.C., a broker of television and radio stations, and to contact John Cunney who works there. (*Id*. ¶ ¶ 2-3.) Mr. Potharlanka did so, and in response Mr. Cunney sent Mr. Potharlanka in California an offering

memorandum that identified WPHA and Defendant's other television stations for sale. (*Id*. ¶ 3.) Over several months, Mr. Potharlanka negotiated a Letter of Intent between the two parties regarding Plaintiff's purchase of Defendant's Philadelphia television station. (*Id*. ¶ 4.) During those negotiations, Mr. Potharlanka sent emails to both Mr. Cunney and Mr. Weigner that contained Plaintiff's California address and California telephone numbers. (*Id*. ¶ 4.) Mr. Potharlanka also received several telephone calls from Mr. Cunney and Mr. Wiegner to those California telephone numbers and received emails from them at Plaintiff's email address. (*Id*.)

Mr. Potharlanka signed the Letter of Intent on behalf of Plaintiff in California on July 19, 2012. (*Id*. ¶ 5.) The Letter of Intent is on Plaintiff's letterhead and lists its California address under the signature of Mr. Potharlanka. (*Id.* Ex. A.) The parties eventually signed an Asset Purchase Agreement ("the Agreement"), which was also signed in California by Plaintiff's Chief Executive Officer. (*Id*. ¶ 6.) Following the signing of the Agreement, Plaintiff wired two payments to Defendant and Patrick Communications from Plaintiff's California bank account. (*Id*. ¶ 7.)

Pursuant to the Agreement, the assets to be sold by Defendant included a Class A license from the Federal Communications Commission ("FCC"). (Complaint ¶ 2.) Class A licenses are transferable to other parties only if the FCC has consented. (*Id*. ¶ 3.) The FCC does not consent to such transfers unless the license has been granted a renewal. (*Id*.) Since WPHA's renewal had not been granted, Plaintiff sought certain assurances from Defendant regarding the license through multiple contractual provisions. (*Id*.) These contractual provisions included:

> 5.1     FCC Application. Within five (5) business days of the date of this Agreement, Seller and Buyer shall file an application with the FCC (the "FCC Application") requesting the FCC Consent. Seller and Buyer shall diligently prosecute the FCC Application and otherwise use their best efforts to obtain the FCC Consent as soon as practicable, provided, however, that neither party shall be required to participate in a trial-type hearing or judicial appeal. Seller shall take all action required under FCC rules to give timely public notice of the filing of the FCC Application.

(Dkt. No. 1-1 at 5.)

> 5.2 <u>General.</u> Seller and Buyer shall notify each other of all documents filed with or received from any governmental agency (including the FCC) with respect to this Agreement or the transactions contemplated hereby. Seller and Buyer shall cooperate with the FCC in connection with obtaining the FCC Consent, and shall promptly provide all information and documents requested by the FCC in connection therewith. If either Seller or Buyer becomes aware of any fact relating to it that would prevent or delay the FCC Consent, such party shall promptly notify the other party thereof and the parties shall use commercially reasonable efforts to remove any such impediment.

(*Id*. at 6.)

> 9.1 <u>Cooperation.</u> Each party shall cooperate fully with the other in taking any commercially reasonable actions (including to obtain the required consent of any governmental instrumentality or any third party) necessary to accomplish the transactions contemplated by this Agreement, including, but not limited to, the prompt satisfaction of any condition to the Closing set forth herein.

(*Id*. at 10.) The Agreement also included a provision that allowed either party to terminate the agreement after September 1, 2013. (*Id*. at 15.)

Following the execution of the Agreement, Plaintiff proceeded to communicate and cooperate with Defendant, as the Agreement required. Following a meeting between Defendant and the FCC on February 7, 2013, Plaintiff encouraged Defendant to submit to the FCC's instructions in order to place WPHA in a position of compliance with FCC rules. (Complaint ¶ 39.) When Defendant "offered a litany of excuses for delaying its response to the FCC," Plaintiff communicated to Defendant's counsel that "the best way to resolve the FCC's inquiry was to submit the best facts that Defendant could gather to demonstrate WPHA's compliance with FCC rules." (*Id*. ¶¶ 42-43.) Plaintiff continued to communicate with Defendant, and on March 29, 2013, Plaintiff called Defendant's counsel "to voice [Plaintiff's] frustration with DTV's delay." (*Id*. ¶ 44.) On May 21, 2013, due to further delay in Defendant's cooperation with the FCC, Plaintiff "stepped in, consistent with its [Asset Purchase Agreement] obligation to cooperate in obtaining the FCC's consent to the assignment. [Plaintiff] detailed for [Defendant] five cases to cite to support [Defendant's] arguments to the FCC." (*Id*. ¶ 47.) On May 23, 2013, Defendant submitted a memorandum to the FCC, although it did not address the FCC's central complaint

about WPHA. (*Id.* ¶ 49.)

Plaintiff continued to devote time and resources to remove obstacles to the Class A license's approval. (*Id.* ¶ 51.) "After [Defendant] stated that it would rather not spend the money, [Plaintiff] voluntarily paid for new equipment that allowed WPHA to shift its transmissions to channel 24, thereby complying with the FCC Settlement Agreement and helping to resolve" an interference complaint by a New Jersey television station, WPSJ. (*Id.*) As the termination-option date approached, Plaintiff asked Defendant to extend the date and submit additional facts to the FCC Enforcement Bureau. (*Id.* ¶ 54.) Defendant declined both. (*Id.*) Once Defendant submitted its memorandum to the FCC "concerning the remedy for WPHA's alleged refusal to grant access to the FCC field agent," Plaintiff prepared for closing. (*Id.* ¶¶ 58-60.) Plaintiff "(i) finalized and sent the closing documents to DTV, and (ii) waived certain closing conditions. It further agreed not to exercise its termination option if the FCC did not approve the assignment by September 1, and again asked DTV to execute an Agreement amendment extending the option date." (*Id.* ¶ 60.)

Defendant purported to terminate the Agreement on March 11, 2014. (Id. ¶¶ 13, 65.) This lawsuit followed.

## LEGAL STANDARD

When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that the court has jurisdiction over the defendant. *See Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1128–29 (9th Cir. 2003). "Where, as here, a court decides a motion to dismiss for lack of personal jurisdiction without an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts to withstand the motion to dismiss." *Longyu Int'l Inc. v. E-Lot Electronics Recycling Inc.*, 2:13-CV-07086-CAS, 2014 WL 1682811, at *2 (C.D. Cal. Apr. 29, 2014). In such cases, "we only inquire into whether [the plaintiff's] pleadings and affidavits make a prima facie showing of personal jurisdiction." *Caruth v. Int'l Psychoanalytical Ass'n*, 59 F.3d 126, 128 (9th Cir. 1995). Moreover, "for the purpose of this demonstration, the court resolves all disputed facts in favor of the plaintiff." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006).

"Where, as here, no federal statute authorizes personal jurisdiction, the district court

applies the law of the state in which the court sits." *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011). California's long-arm statute has the same due process requirements as the federal long-arm statute. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir. 2004). The Due Process Clause requires that nonresident defendants have "minimum contact" with the forum state such that the exercise of personal jurisdiction "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945).

**DISCUSSION**

A court may exercise either general or specific jurisdiction over an out-of-state defendant. *See Daimler AF v. Bauman,* 134 S.Ct. 746, 754 (2014). Plaintiff maintains this Court has specific jurisdiction of Defendant. "A court may exercise specific jurisdiction over a foreign defendant if his or her less substantial contacts with the forum give rise to the cause of action before the court. The question is whether the cause of action arises out of or has a substantial connection with that activity." *Doe v. Unocal*, 248 F.3d 915, 923 (9th Cir. 2001) (internal citations and quotation marks omitted); *see also Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011) ("[S]pecific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." ) (internal quotation marks and citation omitted). The Ninth Circuit has developed a three-prong test for analyzing specific jurisdiction:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger*, 374 F.3d at 802.

### A. Purposeful Availment

Under the first prong, a plaintiff must establish that the defendant "either purposefully

1 availed itself of the privilege of conducting activities in California, or purposefully directed its
2 activities toward California." *Schwarzenegger*, 374 F.3d at 802.  A purposeful availment analysis
3 "is most often used in suits sounding in contract," while a purposeful direction analysis "is most
4 often used in suits sounding in tort." *Id*.  Accordingly, the Court will apply the purposeful
5 availment test.

6     "A showing that a defendant purposefully availed himself of the privilege of doing
7 business in a forum state typically consists of evidence of the defendant's actions in the forum,
8 such as executing or performing a contract there." *Id*.; *see also Sher v. Johnson*, 911 F.2d 1357,
9 1362 (9th Cir. 1990) ("Purposeful availment requires that the defendant have performed some type
10 of affirmative conduct which allows or promotes the transaction of business within the forum
11 state.") (internal quotations marks omitted).  However, "merely contracting with a resident of the
12 forum state is insufficient to confer specific jurisdiction over a nonresident." *Ziegler v. Indian*
13 *River Cnty.*, 64 F.3d 470, 473 (9th Cir. 1995).  A contract is only an intermediate step that
14 connects prior negotiations with future consequences, the real object of a business transaction.
15 Therefore, courts consider "prior negotiations and contemplated future consequences, along with
16 the terms of the contract and the parties' actual course of dealing" to determine "whether the
17 defendant purposefully established minimum contacts within the forum." *Burger King Corp. v.*
18 *Rudzewicz*, 471 U.S. 462, 479 (1985); *see also Longyu*, 2014 WL 1682811 at *2 ("[A] court must
19 evaluate four factors to determine whether this prong is met: (1) prior negotiations, (2)
20 contemplated future consequences, (3) the terms of the contract, (4) the parties' actual course of
21 dealing.").

22     *1.    Prior Negotiations*

23     "If the defendant directly solicits business in the forum state, the resulting transactions will
24 probably constitute the deliberate transaction of business invoking the benefits of the forum state's
25 laws." *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 840 (9th Cir. 1986).
26 "Similarly, conducting contract negotiations in the forum state will probably qualify as an
27 invocation of the forum law's benefits and protections." *Id*.
28     Plaintiff first argues that Defendant, through Patrick Communications, solicited Plaintiff

6

with an "initial contact" in the forum. (Dkt. No. 19 at 17.)  "Soliciting business in the forum state will generally be considered purposeful availment if that solicitation results in contract negotiations or the transaction of business." *Shute v. Carnival Cruise Lines*, 897 F.2d 377, 381 (9th Cir. 1990), *rev'd on other grounds*, 499 U.S. 585 (1991).  Examples of solicitation that may satisfy purposeful availment include "advertising in the forum State" or "marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Id.* at 382.

Here, the record establishes that Plaintiff, rather than Defendant, made the "initial contact" that eventually resulted in contract negotiations.  Plaintiff contacted Defendant outside of California to inquire if Defendant had any television stations for sale. (Dkt. No. 19-1 ¶ 2.) Nonetheless, the record also supports a finding that while Plaintiff made the initial contact, Defendant in fact solicited Plaintiff's business.  In response to Plaintiff's inquiry, Defendant—through its broker—sent an offering memorandum to Plaintiff, a California resident, which listed several television station assets that were for sale. (*Id.* ¶ 3.)  The memorandum requested that Plaintiff contact the broker "'for additional information regarding this opportunity or to express interest in pursuing an acquisition of any or all the stations.'" (*Id.*)  This offering memorandum constitutes Defendant's solicitation of business from Plaintiff in California.  This weighs strongly in favor of a finding of purposeful availment.

The location of the negotiations does not support purposeful availment because Defendant never traveled to California to conduct any negotiations. *See McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 816 (9th Cir. 1988).  Similarly, that Defendant's agent contacted Plaintiff by telephone and email in California during the negotiations does not support purposeful availment. *See Roth v. Garcia Marquez*, 942 F.2d 617, 622 (9th Cir. 1991) ("[U]se of the mails, telephone, or other international communications simply do not qualify as purposeful activity invoking the benefits and protection of the [forum] state." (internal quotation marks omitted)).  Nonetheless, Defendant's absence from California during negotiations does not defeat personal jurisdiction. *See Id*. ("[T]he physical absence of the defendant and the transaction from the forum cannot defeat the exercise of personal jurisdiction." (internal quotation marks omitted)).

Nor does Plaintiff's signing of the contract in California avail Defendant of the benefits

and protections of California's laws. "The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). Here, Plaintiff's signing of the Letter of Intent and Agreement in California constitutes a unilateral activity and does not establish Defendant's purposeful availment of California's laws. There is no allegation that Defendant travelled to California to sign any contract; even if it did, the execution of the contract in the forum would likely be a mere "formality" that would not support a finding of purposeful availment. *See McGlinchy*, 845 F.2d at 816.

In sum, Defendant's solicitation of Plaintiff's business, although initiated by Defendant, weighs in favor of a finding of purposeful availment, while the location of the negotiations and signing of the documents do not.

### 2. Future Consequences

Under the second factor, "[p]arties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King*, 471 U.S. at 473 (internal quotation marks omitted). "[*Burger King*] insisted that past and future consequences of the contractual arrangement involving a resident of the forum state be evaluated." *Corporate Inv. Business Brokers v. Melcher*, 824 F.2d 786, 789 (9th Cir. 1987); *see also Hirsch v. Blue Cross, Blue Shield of Kansas City*, 800 F.2d 1474, 1478 (9th Cir. 1986) ("The purposeful availment prong is satisfied when a defendant takes deliberate actions within the forum state or creates continuing obligations to forum residents.").

The defendant in *Burger King* was a Michigan citizen who entered into a 20-year franchise contract with Burger King to operate a restaurant in Michigan. *Burger King*, 471 U.S. at 462. Burger King brought an action against the defendant in Florida, the site of its headquarters. *Id*. The Court held that the defendant purposefully availed himself of the laws of Florida when he entered into the franchise agreement with Burger King, reasoning that the parties' contract was a "carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida." *Id*. at 480. Further, the defendant had accepted a "long-term"

agreement that consisted of "exacting regulation of his business" from Burger King's Florida headquarters. *Id*. In other words, the contract had a "*substantial* connection with" the forum state. *Id*. at 479 (internal quotation marks omitted). The Court concluded that, "[i]n light of [the defendant's] voluntary acceptance of the long-term and exacting regulation of his business from Burger King's Miami headquarters, the quality and nature of his relationship to the company in Florida can in no sense be viewed as random, fortuitous, or attenuated." *Id.* at 480 (internal quotation marks omitted).

The continuing obligations here were substantial and wide-reaching. While the parties' contractual relationship would not have continued for as long as envisioned in *Burger King*, the negotiations through the termination of the Agreement lasted from January 2012 until March 2014, a substantial period of time. The joint obligations required by the Agreement "committed the parties to diligently prosecute the assignment application and otherwise use their best efforts to obtain the FCC Consent as soon as practicable," and "required the parties to cooperate with the FCC in connection with obtaining the FCC Consent." (Complaint ¶ 22) (internal quotation marks omitted). More significantly, the parties agreed to "cooperate fully with [each] other in taking any commercially reasonable actions . . . necessary to accomplish the transactions." (*Id*. ¶ 23.) As discussed further below under the course of dealing factor, these contractual obligations produced months of substantial coordination and joint effort to prepare Defendant's FCC license for renewal.

Defendant emphasizes that all the future cooperation in connection with the contract does not affect California: "there are no duties to be performed other than to meet the regulatory requirements of the FCC in *Washington D.C.*, consummate the transaction in *Maryland*, and send money from anywhere to escrow in *Maryland* to close." (Dkt. No. 21 at 4) (emphasis added). However, Defendant still committed itself to ongoing obligations, including cooperation, with a citizen of another state. *See Burger King*, 471 U.S. at 473.

The parties' significant continuing obligations to each other under the Agreement favor a finding of purposeful availment.

//

*3. Terms*

Terms that provide fair notice to a defendant that he may possibly be subject to suit in the forum state weigh in favor of a purposeful availment finding. *See Burger King*, 471 U.S. at 463; *see also Doe*, 248 F.3d at 924. Plaintiff asserts that three terms in the Agreement weigh in favor of a purposeful availment finding.

First, Plaintiff contends that Defendant made "false representations" to Plaintiff in the Agreement that Plaintiff signed in California. (Dkt. No. 19 at 18.) This argument, however, describes the parties' behavior rather than any particular contractual term.

Second, Plaintiff identifies an Agreement term that requires all communications to be sent to Plaintiff's California address, along with a Washington D.C. address. (*Id.*; Dkt. No. 1-1 at 17.) In *Longyu*, the court held that contractual terms "slightly favor[ed]" a finding of purposeful availment where "the invoices submitted by E–Lot to Longyu unambiguously reflect Longyu's California address." 2014 WL 1682811 at *5. The court further held that this fact helped put the defendant on "reasonable notice" that it could be called into court in California. *Id.* (internal quotation marks omitted). And in *Sher v. Johnson*, the Ninth Circuit held that while a law firm's phone calls and mail sent into California *standing alone* do not constitute a "substantial connection" with California, those actions do weigh in favor of a purposeful availment finding. 911 F.2d 1357, 1362, 1363-64 (9th Cir. 1990). Thus, this Agreement term weighs slightly in favor of a finding of purposeful availment.

Finally, Plaintiff asserts that the payments from it to Defendant required by the Agreement were made from Plaintiff's California bank account, and thus weigh in favor of a purposeful availment finding. (Dkt. No. 19 at 18.) The *Longyu* court found that similar wire transfers from a plaintiff in the forum to a non-forum defendant weighed slightly in favor of personal jurisdiction. 2014 WL 1682811, at *5. Although this fact certainly puts Defendant on notice that it is contracting with a California entity, since the wire transfer was Plaintiff's unilateral activity, the transfer cannot be considered an act purposefully availing Defendant to the laws of California. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416-17 (1984) ("Common sense and everyday experience suggest that, absent unusual circumstances, the bank on which a

10

check is drawn is generally of little consequence to the payee and is a matter left to the discretion of the drawer. Such unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction."). Thus, the Court will not give any weight to the wire transfers.

Defendant also contends that the contractual term providing for the application of Delaware law weighs against a finding of purposeful availment. (Dkt. No. 21 at 3.) In *Doe v. Unocal*, the Ninth Circuit held that there was no purposeful availment, in part because the contract specified the governing law to be that of jurisdictions other than the forum state. 248 F.3d at 924. The Agreement specifies that the laws of Delaware shall govern the "construction and performance" of the contractual agreement. (Dkt. No. 1-1 at 16.) Thus, the choice-of-law provision weighs against purposeful availment.

While the governing law clause in the contract weighs against purposeful availment, Plaintiff's California address in the Agreement does favor a finding of specific jurisdiction. Therefore, the contract terms, considered as a whole, do not weigh for or against a finding of purposeful availment.

### 4. *Course of Dealing*

The "quality and nature" of Defendant's relationship with the company in California, as seen through the parties' year-plus course of dealing, "can in no sense be viewed as random, fortuitous, or attenuated." *Burger King*, 471 U.S. at 480 (internal quotation marks omitted). As noted above, the parties' Agreement required them to jointly endeavor to ensure all barriers to the sale of Defendant's FCC license to Plaintiff. The record before the Court shows extensive communication and coordination between the parties (though Plaintiff alleges that Defendant fell short of its obligations). For instance, for nearly a year, the parties worked together to ensure compliance with FCC regulations, collaborated in devising legal arguments for Defendant to present to the FCC, and met with FCC staff on various occasions to urge a prompt resolution of the license renewal issue. (*See* Dkt. No. 1 ¶¶ 39, 43-44, 47, 64.) Further, when Defendant received a complaint from a New Jersey television station regarding interference with its broadcast

11

1  signal in violation of a previous FCC settlement agreement, Defendant informed Plaintiff about
2  the problem and stated that it would "rather not spend the money" and asked Plaintiff to pay for
3  the fix. (*Id.* at ¶ 51; Dkt. No. 19-1 ¶ 8.) To avoid further FCC entanglement, Plaintiff paid for the
4  installation of the new equipment to alleviate the interference issues, costing Plaintiff $22,950.
5  (Dkt. No. 19-1 ¶ 8.) The parties' agreement regarding the installation of the equipment was
6  drafted by Defendant and addressed to Plaintiff's California address. (Dkt. No. 19-3.) Plaintiff
7  also tried to renegotiate the termination clause's date once the original date approached and
8  Defendant had still not responded to the FCC's inquiries. (Complaint ¶¶ 53-54.) These
9  interactions between the parties in an attempt to complete the transaction convey the wide-
10 reaching and substantial obligations that were a consequence of the Agreement.

11       Defendant's arguments to the contrary are unpersuasive. Defendant asserts that because
12 the physical locations for performance of the contract were all outside California—compliance
13 with the FCC occurs in Washington D.C.; final consummation is in Maryland—it was "not doing
14 business in California and had no continuing performance obligations in California." (Dkt. No. 21
15 at 4.) However, the defendant in *Burger King* also did not do business in Florida and he had no
16 continuing performance obligations there. What matters is the "quality and nature" of the
17 defendant's relationship with the forum plaintiff; that a defendant lacks physical ties to California
18 is not dispositive. *See Burger King*, 471 U.S. at 479 (noting that defendant's only physical tie to
19 Florida was his business partner's brief training course in Miami, which the Court did not factor in
20 to its decision).

21       In *Richmond Technologies, Inc. v. Aumtech Business Solutions*, for example, a court in this
22 district found purposeful availment even though the defendant's performance of the contract
23 occurred in India. 2011 WL 2607158, at *5 (N.D. Cal. July 1, 2011). There, the defendant
24 Aumtech India entered into a business relationship with plaintiff ePayware "that contemplated
25 ongoing obligations to ePayware, its employees, and its customers in California." *Id.* The court
26 found that, "[a]lthough Aumtech India performed its obligations from its offices in New Delhi,
27 India, the MoU required weekly and monthly reports to ePayware in California." The court
28 concluded that Aumtech India's continuing performance obligations to the California company

favored a finding of purposeful availment. As in *Richmond Technologies*, while Defendant performed (or failed to perform) its obligations outside of California, Defendant nonetheless owed continuing duties to Plaintiff in California, the "quality and nature" of which constituted a "substantial" connection with the forum. *Burger King*, 471 U.S. at 479.

Upon consideration of the various factors including the prior negotiations, future consequences, terms, and course of dealing surrounding the contractual agreement, a finding of purposeful availment is warranted. The prior negotiations factor is neutral or slightly favors purposeful availment, and the future consequences and course of dealing favor a finding of purposeful availment. Furthermore, the terms of the agreements as a whole do not favor or disfavor a finding of purposeful availment. Therefore, upon the balance of the four factors, the Court finds that Defendant purposefully availed itself of the protections and benefits of California's laws.

### B. The Claims' Relation to Defendant's Forum-Related Activities

"This requirement is met if, but for a defendant's forum-related activities through which a defendant purposely avails itself of the forum, the plaintiff would not have suffered injury." *Callaway Golf Corp. v. Royal Canadian Golf Ass'n*, 125 F. Supp. 2d 1194, 1204 (C.D. Cal. 2000) (internal quotation marks omitted). If Defendant had not done business with Plaintiff and purposefully availed itself of the forum-state, Plaintiff would have no claim against it because it would not have suffered an injury that resulted out of the alleged breach of contract. *See Ballard v. Savage*, 65 F.3d 1495, 1500 (9th Cir. 1995). In fact, Defendant does not contest this requirement of the specific jurisdiction test. The claim is related to Defendant's forum-related activities.

### C. Reasonableness

Personal jurisdiction over a case must not offend "traditional notions of fair and substantial justice." *Int'l Shoe*, 326 U.S. at 316. Therefore, it must be reasonable to require the defendant to defend himself in the forum state. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980). Because Plaintiff has satisfied the first two prongs of the Ninth Circuit's test for specific personal jurisdiction, the burden shifts to Defendant to present a compelling case that the exercise

of personal jurisdiction would be unreasonable. *Schwarzenegger*, 374 F.3d at 802. Seven factors are weighed to determine reasonableness, none of which are dispositive:

> 1) the extent of the defendant's purposeful interjection into the forum state's affairs; 2) the burden on the defendant; 3) conflicts of law between the forum and defendant's home jurisdiction; 4) the forum's interest in adjudicating the dispute; 5) the most efficient judicial resolution of the dispute; 6) the plaintiff's interest in convenient and effective relief; and 7) the existence of an alternative forum

*Roth*, 942 F.2d at 623. Defendant fails to satisfy its burden as it does not even present any argument regarding reasonableness. The seven factors are nevertheless discussed briefly below.

In regard to the first factor, Plaintiff claims that Defendant interjected itself into a California business's affairs by soliciting Plaintiff, negotiating over e-mail and calls, and accepting payments. (Dkt. No. 19 at 20). This prong depends on the same analysis that applies to purposeful availment. *See Roth*, 942 F.2d at 623. For the reasons stated above, the parties' business relationship was relatively extensive and proceeded over the course of a year and a half. Therefore, the first factor weighs in favor of a finding of reasonableness.

For the second factor, Plaintiff argues that Defendant has not offered any reason as to why the burden on it would be so great as to deprive it of due process. (Dkt. No. 19 at 21.) Plaintiff claims that due to recent advancements in transportation and communications the burden on Defendant will not be "so great an inconvenience as to deprive DTV of due process." (Dkt. No. 19 at 20-21) (internal quotation marks omitted.) Plaintiff is correct in stating so, and unlike *Roth* and *Sinatra*, Defendant here is not based outside of the country. *See Roth*, 942 F.2d at 623; *Sinatra v. Nat'l Enquirer*, Inc., 854 F.2d 1191, 1198 (9th Cir. 1988). Furthermore, Defendant has not provided any evidence that the burden would be overwhelming for the company. *See Brand v. Menlove Dodge*, 796 F.2d 1070, 1075 (9th Cir. 1986) (stating that it may be inconvenient for a small company to defend itself in certain forums). Therefore, the burden on Defendant is not substantial enough to weigh against a finding of reasonableness.

Plaintiff also argues that the extent of conflict with the sovereignty of Defendant's state is irrelevant here. (Dkt. No. 19 at 21.) While it is not completely irrelevant, it is indeed a lesser

14

barrier when the defendant resides in another state rather than in a foreign nation. *Roth*, 942 F.2d at 623; *Pacific Atlantic Trading Co., Inc. v. M/V Main Exp.*, 758 F.2d 1325, 1330 (9th Cir 1985) ("[W]hen the nonresident defendant is from a foreign nation, rather than from another state in our federal system, the sovereignty barrier is higher, undermining the reasonableness of personal jurisdiction."). Therefore, since Defendant is not from a foreign nation and has not demonstrated that a conflict with the sovereignty of its home state exists, this factor does not weigh against the reasonableness component of personal jurisdiction.

The fourth factor weighs in favor of a finding of reasonableness because, as Plaintiff cites, "[a] State generally has a manifest interest in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." *Burger King*, 471 U.S. at 473 (internal quotation marks omitted). Here, Plaintiff is a resident of California, and therefore California has an interest in providing itself as a forum for resolving the current dispute.

The fifth factor does not tilt the balance in either direction because either California or Defendant's home-state would both require about the same amount of out-of-state witnesses to attend a trial in either state. *See Roth*, 942 F.2d at 624 (considering the number of witnesses that would have to travel to the forum).

It will indeed be more convenient for Plaintiff to litigate the issue in the same state where its office is based. Therefore, the sixth factor favors a finding of reasonableness.

The last factor favors Defendant, because the test is not whether the current forum state is more convenient for Plaintiff, but rather whether Plaintiff would be precluded from adjudicating the dispute in a different forum. *Roth*, 942 F.2d at 624-25. The burden is on the Plaintiff to provide evidence that it would be precluded from doing so. *Id*. at 624. Plaintiff has not done so, but rather has conceded that another forum exists. (Dkt. No. 19 at 21.)

In determining the reasonableness of litigating the dispute in California, factors two, three, four, and six favor the Plaintiff. Only factor seven favors Defendant and a finding against reasonableness. Moreover, factor five does not tilt the balance either way. On balance, it is reasonable to subject Defendant to defend itself in California.

//

**CONCLUSION**

Defendant's purposeful availment of California, its forum-related activities, and the reasonableness of having to defend itself in this Court favor a finding of specific jurisdiction. For the reasons stated, Defendant's Motion to Dismiss for Lack of Personal Jurisdiction is DENIED.

**IT IS SO ORDERED.**

Dated: Aug. 1, 2014

Jacqueline Scott Corley
United States Magistrate Judge