UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOCUSPOINT NETWORKS, LLC, <br>     Plaintiff, <br>     v. <br> D.T.V. LLC, <br>     Defendant. | Case No. 14-cv-01278-JSC <br><br> **ORDER RE: MOTION FOR JUDGMENT ON THE PLEADINGS** <br> Re: Dkt. No. 75 |

This action arises out of Plaintiff Local Point Networks' agreement to purchase a television station in Philadelphia, Pennsylvania from Defendant D.T.V., LLC ("DTV"). Plaintiff's first amended complaint ("FAC") brings the following seven causes of action stemming from DTV's termination of the agreement: (1) breach of contract; (2) in the alternative, breach of the implied covenant of good faith and fair dealing; (3) attorneys' fees under the purchase agreement; (4) fraud supporting specific performance; (5) equitable or negligent misrepresentation for specific performance; (6) equitable estoppel; and (7) unjust enrichment. (*Id.*) Now pending before the Court is Defendant's motion for judgment on the pleadings as to all claims in the SAC. (Dkt. No. 75.) Having carefully reviewed the parties' submissions, and having had the benefit of oral argument on May 7, 2015, the Court GRANTS IN PART and DENIES IN PART DTV's motion.

## BACKGROUND

### A. Factual Background

The Court summarized many of the factual allegations of the initial complaint in detail in its August 1, 2014 Order (Dkt. No. 39), which it incorporates by reference. Nevertheless, that Order included jurisdictional allegations not germane to the instant motion, and the FAC adds new facts that have occurred since the initial complaint was filed. (*See* Dkt. No. 61 at 2.) The Court

therefore reiterates the allegations here.

Defendant owns and operates the television station WPHA in Philadelphia, Pennsylvania, that holds a Class A broadcast license from the FCC. (Dkt. No. 67 ¶¶ 2, 19.) On an October 26, 2012, DTV and PLN entered an Asset Purchase Agreement (the "Purchase Agreement") in which DTV contracted to sell certain WPHA assets, including the Class A broadcast license, to Plaintiff for $6.4 million. (*Id.* ¶¶ 2, 20; *see also* Dkt. No. 62-1 at 29.) An assignment of a broadcast license cannot legally take effect without FCC consent. (Dkt. No. 67 ¶¶ 3, 21.) Accordingly, the Purchase Agreement provided that the sale "shall be within 10 business days after the FCC grant of its consent to the assignment of licenses" to Plaintiff. (Dkt. No. 62-1, Art. 4.) The Purchase Agreement also included provisions addressing the parties' agreement to take certain steps in an attempt to obtain that FCC consent. (*See id.* Arts. 5-9.) Among them, the Purchase Agreement required the parties to "diligently prosecute" the assignment application and "otherwise use their best efforts to obtain the FCC Consent as soon as practicable." (*Id.* § 5.1.) Similarly, the Purchase Agreement required the parties to "cooperate with the FCC in connection with obtaining the FCC Consent" and to "promptly provide all information and documents requested by the FCC in connection therewith." (*Id.* § 5.2) The parties also agreed to cooperate fully with each other "in taking any commercially reasonable actions (including to obtain the required consent of any governmental instrumentality or any third party) necessary to" obtain FCC Consent. (*Id.* § 9.1.)

The Purchase Agreement also provided for various circumstances in which one or both parties could terminate the agreement. In particular, the Purchase Agreement provided:

> 15.1 Termination. This Agreement may be terminated at any time prior to the Closing [the asset sale] as follows:
>
> (a)   by mutual written consent of Seller and Buyer;
>
> (b)   by written notice of Seller to Buyer if Buyer has breached in any material respect any of its representations or warranties or other terms of this Agreement, or has defaulted in any material respect in the performance of any of its covenants or agreements herein contained, and such breach or default was not cured in accordance with the Cure Period . . . ;
>
> (c)   by written notice of Buyer to Seller if Seller has breached in any material respect any terms of this Agreement, or has defaulted in any material respect in the performance of any of its covenants or

agreements herein contained, and such breach or default was not cured in accordance with the Cure Period provision [ ];

(d)   by written notice of Seller to Buyer, or Buyer to Seller, if the FCC designates the FCC Application [i.e., the parties' request for FCC Consent] for hearing by a written action or denies the FCC Application by Final Order; or

(e)   by written notice of Seller to Buyer, or Buyer to Seller, on or after September 1, 2013, if the Closing shall not have been consummated on or before the date of such notice.

(Dkt. No. 62-1 § 15.1) Further, Section 15.2(a) states that termination does not relieve a party of its earlier breaches. (*Id.* § 15.2) In addition, the Purchase Agreement contains a choice-of-law provision indicating that Delaware law applies to all disputes arising out of the agreement.[1] (*See* Dkt. No. 62-1 § 16.5.)

The FCC did not grant the FCC Consent; as it turned out, contrary to DTV's express warranties in the Purchase Agreement that it was not the subject of any pending or threatened FCC litigation and that it was in full compliance with all FCC rules, DTV had not operated in compliance with FCC regulations and had been the subject of an investigation since 2007. (*See* Dkt. No. 67 ¶¶ 8-11, 34-35.) Specifically, DTV violated a regulation requiring a station to maintain a main studio open for inspection by FCC agents any time during business hours. (*Id.* ¶ 35.)

The FCC issued Notices of Apparent Liability for Forfeiture identifying DTV's violations in February 2013 and April 2014. (*Id.* ¶ 65.) DTV did not submit a response to the FCC until August 15, 2013—six months after the first Notice of Apparent Liability and a mere three weeks before the September 1 deadline when DTV could choose to terminate the Purchase Agreement pursuant to Section 15.1(e). (*Id.* ¶ 40; *see also* Dkt. No. 62-1 § 15.1(e).) Plaintiff alleges that

---

[1] Specifically, the Purchase Agreement provides:

> To the extent not governed by federal communications laws, the construction and performance of this Agreement shall be governed by the laws of the State of Delaware applicable to contracts made and to be fully performed within such State, without giving effect to the choice of law provisions thereof that may require the application of the laws of any other state.

(Dkt. No. 62-1 § 16.5)

1  DTV purposefully chose to delay its response to the FCC so that there would be no consent to
2  assignment and it could therefore "run out the clock" on the Purchase Agreement and instead sell
3  WHPA's Class A broadcast license at a higher price at an upcoming auction, since the value had
4  appreciated. (*See* Dkt. No. 67 ¶¶ 40-50.) Four days after submission of its response, DTV
5  "threatened to terminate the [Purchase Agreement] . . . if the FCC did not approve the assignment
6  application by September 1." (*Id.* ¶ 59.) DTV also denied Plaintiff's request to extend the option
7  date. (*Id.* ¶ 60.) The FCC did not complete its investigation in time, and DTV then reported that it
8  was considering exercising its option to terminate the Purchase Agreement so that it could sell the
9  Class A license at an upcoming auction. (*Id.* ¶ 62.) Ultimately, DTV sent a notice terminating the
10 Purchase Agreement on March 11, 2014. (*Id.* ¶ 64.)

11 Plaintiff initiated this action shortly thereafter on March 19, 2014. (*See* Dkt. No. 1.) The
12 Court denied DTV's first motion to dismiss, which asserted lack of personal jurisdiction. (*See*
13 Dkt. No. 39.) After the parties exchanged substantial discovery, the Court granted their request to
14 allow Plaintiff to file an amended complaint. (Dkt. No. 66.) Plaintiff filed the FAC on February
15 16, 2015. (Dkt. No. 62-2.) DTV's motion for judgment on the pleadings followed. (Dkt. No. 75.)
16 DTV notes that it had "insufficient time to file a Rule 12(b)(6) motion in response to the FAC in
17 light of [its change in counsel]" and filed the instant 12(c) motion instead. (*Id.* at 8.)

## LEGAL STANDARD

19 "After the pleadings are closed, but within such time as not to delay the trial, any party
20 may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). In deciding a Rule 12(c)
21 motion, the court may consider "documents attached to the complaint, documents incorporated by
22 reference in the complaint, or matters of judicial notice." *United States v. Ritchie*, 342 F.3d 903,
23 908 (9th Cir. 2003). A court "must accept all factual allegations in the complaint as true and
24 construe them in the light most favorable to the non-moving party." *Fleming v. Pickard*, 581 F.3d
25 922, 925 (9th Cir. 2009) (citation omitted); *see also Yakima Valley Mem'l Hosp. v. Wash. State*
26 *Dep't of Health*, 654 F.3d 919, 925 (9th Cir. 2011). Accepting all allegations of the non-moving
27 party as true, judgment "is proper when the moving party clearly establishes on the face of the
28 pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as

1   a matter of law." *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1550 (9th
2   Cir. 1989); *see also Lyon v. Chase Bank USA, N.A.*, 656 F.3d 877, 883 (9th Cir. 2011). When a
3   Rule 12(c) motion is used as a vehicle for a Rule 12(b)(6) motion after an answer is filed, or when
4   it is functionally equivalent to a motion to dismiss for failure to state a claim, the same standard
5   applies to both. *Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989). In other
6   words, the standard of review is "functionally identical" to the Rule 12(b)(6) standard. *Cafasso,*
7   *U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011). "Dismissal
8   [of claims] can be based on the lack of a cognizable legal theory or the absence of sufficient facts
9   alleged under a cognizable legal theory." *Conservation Force v. Salazar*, 646 F.3d 1240, 1242
10  (9th Cir. 2011) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)).

## DISCUSSION

DTV argues that it is entitled to judgment on the pleadings for all seven claims for relief in the FAC. The Court will address each in turn.

### A.   First Claim for Relief:  Breach of Contract

Plaintiff's first claim for relief alleges that DTV breached the Purchase Agreement by failing to diligently prosecute the assignment application, use its best efforts to obtain FCC consent as soon as practicable, cooperate with the FCC in connection with obtaining the FCC Consent, promptly provide all information and documents that the FCC requests, and cooperate fully with Plaintiff in taking any commercially reasonable actions necessary to close the deal in the Purchase Agreement. (Dkt. No. 67 ¶ 70.) Plaintiff contends that DTV's breaches "prevented the occurrence of a closing condition—the FCC's consent to the assignment application—and enabled DTV to attempt to terminate the [Purchase Agreement] under Section 15.1(e)[.]" (*Id.* ¶ 71.) As a remedy for this breach, Plaintiff seeks specific performance of the Purchase Agreement or money damages. (*Id.* ¶¶ 72-74.)

The parties agree that Delaware law governs this contract-based claim given the choice of law provision in the Purchase Agreement. Under Delaware law, the elements of a breach of contract claim are: (1) a contractual obligation; (2) a breach of that obligation by defendant; and (3) a resulting damage to plaintiff. *H-M Wexford LLC v. Encorp., Inc.*, 832 A.2d 129, 140 (Del.

5

1  Ct. Ch. May 27, 2003) (citation omitted).  Notably, DTV does *not* argue that the FAC lacks a
2  cognizable legal theory for establishing that it breached the Purchase Agreement, but rather only
3  that the particular remedies Plaintiff seeks—specific performance or damages in the amount of the
4  value of the station at auction—are unavailable.  The Court declines to dismiss the breach of
5  contract claim on these grounds.
6        Under Delaware law, specific performance is an extraordinary remedy that is only
7  available where the parties are capable of performing under the contract.  *See Osborn ex rel.*
8  *Osborn v. Kemp*, 991 A.2s 1153, 1161 (Del. 2010) ("We will order specific performance only if a
9  party is ready, willing, and able to perform under the terms of the agreement.").  "A party is never
10 entitled to specific performance; the remedy is a matter of grace and not of right, and its
11 appropriateness rests in the sound discretion of the court."  *West Willow-Bay Ct., LLC v. Robino-*
12 *Bay Ct. Plaza, LLC*, No. C.A. No. 2742-VCN, 2007 WL 3317551, at *13 (Del. Ch. June 19, 2007)
13 (citation omitted).
14       The Court is not persuaded that specific performance is unavailable as a matter of law.
15 The two cases upon which DTV relies are distinguishable.  In *Charlotte Broadcasting, LLC v.*
16 *Davis Broadcasting of Atlanta LLC*, No. C.A. No. 7793-VCG, 2013 WL 1405509, at *6 (Del. Ch.
17 Jan. 3, 2013), a Delaware court faced with a suit for breach of contract to sell a radio station
18 declined to award specific performance despite contractual language that indicated it was available
19 as injunctive relief.  *Id.* at *6.  The contractual language stated that in the event of breach, the non-
20 breaching party "shall be entitled to an injunction restraining such failure or threatened failure [to
21 close the transaction] and, subject *to* obtaining any necessary FCC consent, to enforcement of this
22 Agreement by a decree of specific performance requiring compliance with this Agreement."  *Id*.
23 The court held that it was "unlikely" that the defendant would be able to maintain a suit for
24 specific performance because the actions of a third party made the required FCC consent
25 "unobtainable."  *Id.*  Here, in contrast, the FAC allegations do not compel a conclusion that FCC
26 consent is unobtainable; in other words, that Defendant is not capable of complying with an order
27 that it specifically comply with its contractual obligations.  Thus, *Charlotte Broadcasting, LLC*
28 does not require dismissal of the breach of contract claim, or even just the demand for specific

performance.

*West Willow-Bay Court* likewise does not mandate dismissal of Plaintiff's demand for specific performance. There, the court considered an agreement for the purchase of real property that was conditioned on consent from a third party lessee. 2007 WL 3317551, at *6-8. The agreement provided that the seller "shall remain expressly responsible for obtaining . . . any and all consents and approvals from all third parties[.]" *Id.* at *10. One third party withheld such consent, and the buyer sued the seller seeking specific performance of the buyer's obligation to obtain the third party's consent. *Id.* at *6-8.

The Delaware court agreed that the seller was contractually obligated to obtain the seller's consent, but found that specific performance was not warranted because whether the third party would consent was out of the seller's control. *Id.* at *13. Here, in contrast, the Court cannot conclude that the FCC's consent is out of DTV's control; to the contrary, drawing all inferences in Plaintiff's favor supports an inference that DTV could obtain FCC consent. Another distinguishing fact is that *West Willow-Bay Court* was before the court on summary judgment. In short, DTV has not persuaded the Court that, as a matter of law, specific performance is unavailable. The Court therefore denies DTV's motion for judgment on the pleadings as to Plaintiff's first claim for relief.

**B.      Second Claim for Relief: Breach of the Implied Covenant of Good Faith and Fair Dealing**

Plaintiff's second claim for relief, pled in the alternative to the first, alleges that DTV breached the implied covenant of good faith and fair dealing. (Dkt. No. 67 ¶¶ 75-80.) Plaintiff seeks specific performance or money damages for the breach. (*Id.* ¶ 80.) DTV seeks judgment on the pleadings on this claim for the same reason as the breach of contract claim: because specific performance is not available and no money damages are alleged. This argument fails for the same reason discussed with respect to the breach of contract claim. In addition, DTV argues that Plaintiff's implied covenant claim fails because Plaintiff has only pleaded breach of the implied covenant based on conduct consistent with express terms of the parties' agreement, which cannot give rise to an actionable claim. (Dkt. No. 75 at 17-18.)

7

"Under Delaware law, an implied duty of good faith and fair dealing is interwoven into every contract." *Anderson v. Wachovia Mortg. Corp.*, 497 F. Supp. 2d 592, 581 (D. Del. 2007) (citing *Chamison v. HealthTrust, Inc.*, 735 A.2d 912, 920 (Del. Ch. 1999)). The purpose of implying a covenant of good faith and fair dealing is to "honor the parties' reasonable expectations" under the contract. *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 447 (Del. 2005). "This implied covenant is a judicial convention designed to protect the spirit of an agreement when, without violating an express term of an agreement, one side uses oppressive or underhanded tactics[.]" *TWA Res. v. Complete Prod. Servs., Inc.*, C.A. No. N11C-08-100 MMJ, 2013 WL 1304457, at *6 (Del. Sup. Ct. Mar. 28, 2013) (citing *Chamison v. Healthtrust, Inc.*, 735 A.2d 912, 920 (Del. Ch. 1999), *aff'd*, 748 A.2d 407 (Del. 2000)). The Delaware Supreme Court

> has recognized the occasional necessity of implying contract terms to ensure the parties' reasonable expectations are fulfilled. This quasi-reformation, however, should be [a] rare and fact-intensive exercise, governed solely by issues of compelling fairness. Only when it is clear from the writing that the contracting parties would have agreed to proscribe the act later complained of . . . had they thought to negotiate with respect to that matter may a party invoke the covenant's protections.

*Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 116 (Del. 2006) (citation omitted). Generally, courts only infer contract terms "to handle developments or contractual gaps that the asserting party pleads neither party anticipated[,]" not developments that the parties "simply failed to consider[.]" *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010) (citation omitted). Moreover, Delaware courts "will only imply contract terms when the party asserting the implied covenant proves that the other party has acted arbitrarily and unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonable expected." *Id*. Thus, the question is whether there is a gap in the agreement that the implied covenant must fill to achieve the reasonable expectation of the parties. *See TWA Res.*, 2013 WL 1304457, at *9. "In order to plead successfully a breach of an implied covenant of good faith and fair dealing, the plaintiff must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." *Fitzgerald v. Cantor*, Civ. A. No. 16297-NC, 1998 WL 842316, at *1 (Del. Ch. Nov. 1998) (citation omitted). "[O]ne generally cannot base a claim for breach of the implied covenant

on conduct authorized by the agreement." *Nemec*, 991 A.2d at 1125-26.

Plaintiff alleges that DTV breached the implied covenant by (1) concealing the ongoing FCC investigation, (2) inducing Plaintiff to agree to a September 2013 termination option, (3) delaying its response to the FCC in order to delay FCC Consent, and (3) "using that delay to trigger and exercise the Purchase Agreement's termination option in the hope of pursuing a better deal elsewhere." (*Id.* ¶ 79.) In essence, Plaintiff's implied covenant claim boils down to the allegation that DTV took advantage of the termination provision by purposefully delaying its response to the FCC to postpone approval in a bad faith effort to avoid the contract so that it could sell the station for an even higher price. There is no provision in the Purchase Agreement that expressly states that the parties agree not to purposefully delay FCC consent; likewise, the Purchase Agreement does not expressly impose obligations on DTV to refrain from this conduct. Therefore there is a "gap" that the implied covenant can fill. Plaintiff alleges that DTV's conduct in using that delay was not anticipated because DTV concealed it and expressly represented that it had no FCC investigations or inquiries that might otherwise delay FCC Consent; this is enough at the pleading stage to infer that neither party anticipated such intentional delay. Drawing all inferences in Plaintiff's favor, the facts alleged give rise to a plausible inference that the parties would have agreed to impose such obligations on DTV had they considered the issue, since the very goal of the Purchase Agreement was for DTV to sell the station to Plaintiff. Thus, Plaintiff has sufficiently stated a claim for breach of the implied covenant of good faith and fair dealing.

DTV nevertheless frames Plaintiff's implied covenant claim as faulting DTV simply for terminating the Purchase Agreement after the September 1, 2013 termination date pursuant to Section 15.1(e), and argues that "invocation of [an] expressly agreed-upon termination provision cannot constitute a violation of the good faith / fair dealing doctrine[.]" (Dkt. No. 75 at 18 (citing *Nemec*, 991 A.2d at 1126, 1128)). DTV is correct that *Nemec* means that a party cannot breach the implied covenant by engaging in conduct that an agreement authorizes. *See Nemec*, 991 A.2d at 1126; *see also TW Res.*, 2013 WL 1304457, at *9 ("If the conduct at issue is authorized by the agreement, the covenant will not be implied."). But this argument ignores the nuance of Plaintiff's theory; it is not the invocation of the September 1 termination provision that Plaintiff

9

alleges breached the implied covenant; rather, it is engaging in bad faith tactics to delay FCC Consent to allow DTV to trigger the termination provision. (*See* Dkt. No. 67 ¶ 79.) The Court therefore declines to grant judgment on the pleadings in DTV's favor on Plaintiff's breach of the implied covenant claim.

### C. Third Claim for Relief: Attorneys' Fees

Plaintiff's third claim is "Attorneys' Fees Under the [Purchase Agreement]." (Dkt. No. 67 ¶¶ 81-85.) A request for attorneys' fees pursuant to a contractual provision "is simply a remedy that is dependent upon prevailing on an actual cause of action – it is not a separate cause of action[.]" (Dkt. No. 75 at 14.) Indeed, the relevant provision of the Purchase Agreement provides that the "*prevailing* party in such litigation shall be entitled . . . to reasonable attorneys' fees and expenses." (Dkt. No. 67 ¶ 84.) Plaintiff concedes that an award of attorneys' fees is a remedy rather than a separate claim for relief. (Dkt. No. 78 at 7.) Accordingly, the Court dismisses the third claim, but Plaintiff may continue to seek reasonable attorneys' fees as a remedy, rather than to pursue such relief as stand-alone cause of action. (*See* Dkt. No. 67 at 25.)

### D. Fourth & Fifth Claim for Relief: Fraud & Negligent Misrepresentation

The fourth claim in the FAC is for "fraud supporting specific performance or, in the alternative, the value of the station." Plaintiff alleges that DTV's representations that it had no ongoing FCC investigations, that it was operating in compliance with FCC regulations, and that it had received no notice of noncompliance with any FCC rules were false and misleading given that DTV had been the subject of an FCC investigation since 2007, and it repeatedly failed to comply with FCC rules from 2012 through 2014. (Dkt. No. 67 ¶ 87-89.) Plaintiff further alleges that DTV made those misrepresentations to induce Plaintiff (1) to enter into the Purchase Agreement and (2) to work diligently to close the transaction, and that Plaintiff relied on the misrepresentations by doing both. (*Id.* ¶ 90.) Plaintiff's fifth claim for relief, negligent misrepresentation for specific performance or, in the alternative, the value of the station, is based on the same purported misrepresentations as the fraud claim, but simply alleges that DTV "should have known" that the statements were false. (Dkt. No. 67 ¶¶ 94, 96.) Under both Delaware and California law, the claims differ only in the level of scienter involved; fraudulent

10

misrepresentation requires knowledge or reckless indifference rather than mere negligence. *See Ventura Cnty. Nat'l Bank v. Macker*, 49 Cal. App. 4th 1528, 1530 (1996); *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. Sup. 1983). As a remedy for both fraudulent and negligent misrepresentation, Plaintiff seeks specific performance of the Purchase Agreement or the estimated value of the station at auction. (*Id.* ¶¶ 92, 99.)

As a threshold matter, the parties dispute what state's law should apply to the newly-added tort claims, including these two misrepresentation claims. The parties agree that California choice of law rules apply, but disagree about the result: DTV contends that California choice of law rules require the Court to consider these tort claims under California law, while Plaintiff argues that California choice of law rules require application of Delaware law to these tort claims because they arise from the same transaction as the contract claims. (*Compare* Dkt. No. 75 at 9, *with* Dkt. No. 78 at 12.) "Whether it is appropriate to decide a choice of law issue at the pleading stage depends on the facts of the individual case." *Cytokinetics, Inc. v. Pharm-Olam Int'l, Ltd.*, No. C-14-0525 JSW, 2015 WL 1056324, at *4 (N.D. Cal. Mar. 10, 2015) (citation omitted). At oral argument, however, Defendant agreed for the purposes of this motion that Delaware law could apply to all the newly-added tort claims. The Court therefore applies Delaware law at this time without prejudice to Defendant arguing that California law should apply further along in this litigation.

The Court addresses the first two tort claims—fraudulent and negligent misrepresentation—together, as they have the same elements except for scienter. *See Associated/ACC Int'l Ltd. v. Dupont Flooring Sys. Franchise Co.*, No. Civ.A. 99-803-JJF, 2002 WL 32332751, at *8 (D. Del. Mar. 28, 2002) (citing *Darnell v. Myers*, 1998 WL 294012, at *5 (Del. Ch. May 27, 1998).[2] The gravamen of Plaintiffs' misrepresentation claims is that DTV

---

[2] Both claims are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *See* Fed. R. Civ. P. 9(b); *Those Certain Underwriters at Lloyd's v. Nat'l Installment Ins. Servs., Inc.*, No. 19804-NC, 2007 WL 2813774, at *5 (Del. Ch. Feb. 8, 2007) (citation omitted) (noting that both fraudulent and negligent misrepresentation are fraud claims subject to Delaware law's heightened pleading standard for fraud claims). However, DTV does not seek to dismiss these claims for failure to plead with particularity.

11

1    misrepresented that it was free and clear of FCC investigations and would work diligently to
2    obtain FCC consent "with the intent of inducing [Plaintiff] to enter into the [Purchase Agreement]
3    and work diligently to close the transaction." (Dkt. No. 67 ¶ 90.) Plaintiff alleges that it relied on
4    these representations by agreeing to the Purchase Agreement and "expending time, energy, and
5    money to comply with its contractual obligations[,]" and as a result of the misrepresentations, the
6    "transaction could not be consummated[.]" (*Id.* ¶ 91.)

7    As pleaded, Plaintiff has alleged a claim for fraudulent inducement—*i.e.*, that it entered the
8    contract in reliance on DTV's misrepresentations. Fraudulent inducement under Delaware law
9    requires that the Plaintiff plead facts sufficient to give rise to a plausible inference that (1)
10   Defendant made a false representation or omission; (2) with the relevant level of scienter; (3) with
11   the intent to induce Plaintiff to act or refrain from acting; (4) justifiable reliance; and (5) resulting
12   injury. *See Lord v. Souder*, 748 A.2d 393, 402 (Del. 2000); *ABRY Partners V, L.P. v. F&W*
13   *Acquisition LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006). Defendant nowhere argues that Plaintiff's
14   FAC insufficiently pleads any of these elements; instead, Defendant argues that the relief Plaintiff
15   seeks is fatal to the claim. From Defendant's perspective, because Plaintiff is claiming that it was
16   fraudulently induced to enter the Agreement, the only possible remedy is rescission and voiding of
17   the contract or damages because "in the absence of fraud there would have been no [Purchase
18   Agreement]." (*Id.* at 14.)

19   But once again, Plaintiff's theory is more nuanced than Defendant acknowledges. Plaintiff
20   does not allege that it would not have entered into an agreement to purchase the station, but that it
21   would have negotiated different terms if Defendant had been candid about its issues with the FCC.
22   (Dkt. No. 67 ¶ 90.) As Defendant has not established that this theory fails as a matter of law, or
23   that even if it survives that specific performance is unequivocally unavailable, Defendant's motion
24   to dismiss these claims must be denied.

25   **E.     Sixth Claim for Relief:  Equitable Estoppel**

26   The sixth cause of action is for equitable estoppel. (Dkt. No. 67 ¶ 107.) DTV's sole
27   argument for dismissal in its initial moving papers is that there is no such cause of action available
28   under California law. (Dkt. No. 75 at 12-13.) At oral argument, however, Defendant again agreed

that for purposes of the motion to dismiss, the Court could apply Delaware law; it made such concession because it believes that even under Delaware law the claim must be dismissed.

Equitable estoppel is a stand-alone equitable claim under Delaware law. *See VonFeldt v. Stifel*, 714 A.2d 79, 87 (Del. 1998); *Micron Tech., Inc. v. Rambus, Inc.*, 189 F. Supp. 2d 201, 213 (D. Del. 2002); *Mirzakhalili v. Chagnon*, No. Civ. A. 18143, 2000 WL 1724326, at *7 n.23 ("[P]laintiff's complaint also states traditional equitable claims, such as a claim for equitable estoppel."); *Moore Bus. Forms, Inc. v. Cordant Holdings Corp.*, Civ. A. No. 13911, 1995 WL 662685, at *9 (Del. Ch. Nov. 2, 1995). To state a claim for equitable estoppel, a plaintiff "must allege inequitable conduct by the defendant that led the plaintiff to change its position, in justifiable reliance on that conduct, to its detriment."[3] *Moore Bus. Forms*, Civ. A. No. 13911, 1995 WL 662685, at *9 (citing *Wilson v. Am. Ins. Co.*, 209 A.2d 902, 903-04 (1965)); *see also VonFeldt*, 714 A.2d at 87 ("To make out a claim of equitable estoppel, plaintiff must show that he was induced to rely detrimentally on defendant's conduct."); *see also Burge v. Fid. Bond & Mortg. Co.*, 648 A.2d 414, 420 (Del. 1994) ("For an estoppel claim to prevail, it must be shown that the party claiming estoppel lacked knowledge or the means of obtaining knowledge of the truth of the facts in question, relied on the party against whom estoppel is claimed, and suffered a prejudicial change as a result of that reliance." (citations omitted)). The defendant's inequitable conduct may be either an affirmative act or a failure to act when a duty so required. *Welshire, Inc. v. Harbison*, 88 A.2d 121, 125 (Del. Ch. 1952), *aff'd*, 91 A.2d 404 (Del. 1952). To satisfy the

---

[3] The elements of equitable estoppel under Delaware law have also been described as follows:

> (1) conduct by the party to be estopped that amounts to a false representation, concealment of material facts, or that is calculated to convey an impression different from, or inconsistent with that which the party subsequently attempts to assert, (2) knowledge, actual or constructive, of the real facts and the other party's lack of knowledge and the means of discovering the truth, (3) the intention or expectation that the conduct shall be acted upon by, or influence, the other party and good faith reliance by the other, and (4) action or forbearance by the other party amounting to a change in status to his detriment.

*Cornerstone Brands, Inc. v. O'Steen*, No. Civ.A. 1501-N, 2006 2788414, at *3 n.12 (Del. Ch. Sept. 20, 2006).

13

1  requirement that plaintiff's reliance be justifiable, the complaint must include some description of
2  the plaintiff's state of mind. *Burge*, 648 A.2d at 420. However, a claim for equitable estoppel will
3  not lie where a party "seeks to obtain the benefit of a bargained-for promise"—*i.e.*, when a party is
4  essentially seeking to define the scope of its rights under an existing, enforceable contract. *See*
5  *Genencor Int'l, Inc. v. Novo Nordisk A/S*, 766 A.2d 8, 12 (Del. 2000).

6        Here, the gravamen of Plaintiff's equitable estoppel argument is that DTV made
7  misrepresentations about its compliance with FCC rules and regulations and about the absence of
8  any FCC investigation, and in reliance on those representations, Plaintiff signed the Purchase
9  Agreement without negotiating provisions that would have better protected its rights. (Dkt. No. 67
10  ¶¶ 102-105.) These allegations appear to state a claim under Delaware law.

11        DTV's one-line argument to the contrary is unavailing. Citing *Genencor International,*
12  *Inc. v. Novo Nordisk A/S*, 766 A.2d 8 (Del. 2000), Defendant insists that no claim for equitable
13  estoppel lies when the alleged promise on which the plaintiff relied is supported by consideration.
14  (Dkt. No. 79 at 4.) In *Genencor*, the Delaware Supreme Court considered whether the Court of
15  Chancery awarded the proper remedies for the plaintiff's breach of contract claim. 766 A.2d at
16  10. The parties had entered into a licensing agreement that resolved patent infringement litigation.
17  One section of the licensing agreement allowed the plaintiff to develop two products using the
18  defendant's patents; another section allowed the plaintiff to develop one licensed product using up
19  to five of the defendant's published patents. The licensing agreement also contained a
20  representation and warranty provision that the five unpublished patents were the "only"
21  unpublished patents that needed to be disclosed. Sometime after the parties executed the
22  agreement, the defendant sought to amend the agreement to include an additional unpublished
23  patent to the representation and warranty provision. The question in the case was whether the
24  defendant would be estopped from asserting the sixth unpublished patent against any of the
25  plaintiff's products. *Id.* at 11. The Delaware Supreme Court determined that equitable estoppel
26  was unavailable since the plaintiff "[was] seeking to enforce a contract supported by valid
27  consideration" and therefore the case involved "a dispute about enforcement of a bargained-for
28  contract right" such that "the remedy [the plaintiff sought was] not equitable estoppel." *Id.* at 12

1  (citations omitted).  Thus, the court concluded, the parties were really seeking a declaration of their rights under the licensing agreement in the event that patent infringement litigation regarding the plaintiff's products should later arise.  *Id.* at 13.

It does not follow from the *Genencor* court's emphasis on consideration that whenever there is consideration there can be no equitable estoppel.  Rather, the Court reads *Genencor* for the proposition that where the plaintiff seeks to enforce a bargained-for right under an existing, enforceable contract, equitable estoppel will not lie.  Thus, a plaintiff may bring an equitable estoppel claim in the alternative to a breach of contract claim.  Defendant, in effect, wants this Court to rule at this early stage that, in the end, equitable estoppel will not apply.  The Court declines the invitation and notes that *Genecor* involved appeal of a summary judgment order and the court's granting of some equitable relief.  We are simply not there yet.

**E.    Seventh Claim for Relief:  Unjust Enrichment**

Plaintiff's final claim for relief is for unjust enrichment.  As with the equitable estoppel claim, Defendant contends that such a cause of action is unavailable under California law.  At oral argument and in its Reply, Defendant argued that this cause of action must also be dismissed under Delaware law because it cannot lie where a plaintiff has alleged the existence of an express contract.

Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity or good conscience."  *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988) (citation omitted).  "Courts developed unjust enrichment, or quasi-contract, as a theory of recovery to remedy the absence of a formal contract."  *ID Biomedical Corp. v. Tm Techs., Inc.*, Civ. A. No. 13269, 1995 WL 130743, at *15 (Del. Ch. Mar. 16, 1995) (citing *Freedman v. Beneficial Corp.*, 406 F. Supp. 917, 923 (D. Del. 1975)).  Unjust enrichment is a separate, stand-alone equitable cause of action under Delaware law.  *See Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 393-94 (Del. Ch. 1999); *see, e.g.*, *BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.*, C.A. No. 3099-VCN, 2009 WL 264088, at *7-8 (Del. Ch. 2009).  To recover on a claim of unjust enrichment, a plaintiff must prove: "(1) an enrichment, (2) an impoverishment, (3) a

15

relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Jackson Nat'l Life Ins. Co.*, 741 A.2d at 393-94. "[T]he threshold inquiry a court must first engage in [is] inquiring whether a contract already governs the relevant relationship between the parties. If a contract comprehensively governs the parties' relationship, then it alone must provide the measure of the plaintiff's rights and any claim of unjust enrichment will be denied." *BAE Sys. Info.*, 2009 WL 264088, at *7-8 (citations omitted). Put simply, it is well settled under Delaware law that a party cannot seek recovery under an unjust enrichment theory where a contract "is the measure of [the] plaintiff's right." *Wood v. Coastal States Gas Corp.*, 401 A.2d 932, 942 (1979); *see also Chrysler Corp. v. Airtemp Corp.*, 426 A.2d 845, 854 (Del. Sup. Ct. 1980).

However, "[i]n some instances both a breach of contract and an unjust enrichment claim *may* survive a motion to dismiss when pled as alternative theories for recovery." *Bae Sys. Info.*, 2009 WL 264088, at *8 (emphasis in original); *Narrowstep, Inc. v. Onstream Media Corp.*, Civil Action No. 5114-VCP, 2010 WL 5422405, at *16 (Del. Ch. Dec. 22, 2010) (citation omitted); *see, e.g.*, *Boulden v. Albiorix, Inc.*, C.A. No. 7051-VCN, 2013 WL 396254, at *14 (Del. Ch. Jan. 31, 2013); *Albert v. Alex Brown Mgmt. Servs., Inc.*, Civ. A. 762-N, 763-N, 2005 WL 2130607, at *8 (Del. Ch. Aug. 26, 2005). One such situation is when there is doubt surrounding the enforceability or the existence of the contract. *Boulden v*, 2013 WL 396254, at *14 (citation omitted); *Albert*, 2005 WL 2130607, at *8. There is no such doubt here. DTV does not contend that the Agreement does not exist or is unenforceable; instead, it argues that it complied with the letter of the Agreement. To put it another way, Plaintiff's unjust enrichment claim is just another way of pleading its claim for breach of the implied covenant of good faith and fair dealing, a claim that depends on the existence of a valid agreement. Plaintiff has not stated, and cannot state, a separate claim for unjust enrichment.

## CONCLUSION

For the reasons explained above, the Court GRANTS IN PART and DENIES IN PART DTV's motion for judgment on the pleadings. The Court dismisses with prejudice Plaintiff's third claim for relief, which brings an action for attorneys' fees; and dismisses the seventh claim for

1    relief, for unjust enrichment, without leave to amend.  Defendant is directed to answer the

2    remaining counts of the FAC by June 5, 2015.

3    This Order terminates Docket No. 75.

4    **IT IS SO ORDERED.**

5    Dated:  May 19, 2015

_____
JACQUELINE SCOTT CORLEY
United States Magistrate Judge

17