1
2
3
4                           UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6

7   LOCUSPOINT NETWORKS, LLC,                Case No.  14-cv-01278-JSC

              Plaintiff,
8
                                            ORDER RE:  MOTIONS FOR
9        v.                                 SUMMARY JUDGMENT

10  D.T.V. LLC,                             Re: Dkt. Nos. 88, 94

              Defendant.
11

12

13          This action arises out of the written agreement of Defendant D.T.V., LLC ("DTV") to sell

14  its television station in Philadelphia, Pennsylvania to Plaintiff LocusPoint Network ("Plaintiff").

15  Now pending before the Court are the parties' motions for summary judgment.  (Dkt. Nos. 88, 94.)

16  Plaintiff seeks summary judgment on its breach of contract and breach of implied covenant causes

17  of action.  It insists that on the record before the Court a trier of fact must find that DTV breached

18  its written warranties, that its breach delayed approval by the Federal Communication

19  Commission ("FCC") of the transfer of the station to LocusPoint Network, and that the delay

20  allowed DTV to terminate the agreement before closing (and after the value of the station

21  increased beyond the sale price).  Plaintiff also contends that under these circumstances, the Court

22  must order DTV to sell the station to Plaintiff at the contract price.  (Dkt. No. 94.)  DTV, on the

23  other hand, seeks summary judgment in its favor on all causes of action.  The gravamen of its

24  argument is that any breach of warranty was immaterial, and DTV properly exercised its right to

25  terminate the agreement.  (Dkt. No. 88.)  Having considered the parties' submissions, and having

26  had the benefit of oral argument on August 6, 2015, the Court GRANTS IN PART Plaintiff's

27  motion for summary judgment and DENIES DTV's motion for summary judgment as set forth

28  below.

United States District Court
Northern District of California

United States District Court
Northern District of California

## SUMMARY JUDGMENT EVIDENCE

Plaintiff acquires television stations "for the purpose of maximizing the spectrum assets values of these stations which could eventually involve selling those stations at the FCC spectrum auction."[1]  (Dkt. No. 92 ¶ 1.)  Defendant DTV is a limited liability company that owns and operates eight television stations, including WPHA in Philadelphia ("WPHA" or "the Station").  Randolph Weigner is DTV's owner.  (Dkt. No. 96-3 ¶ 1.)

In 2012, DTV offered nine television stations for sale, including WPHA.  (*See* Dkt. No. 90-5 at 15.)[2]  DTV initially negotiated a deal to sell WPHA to a different entity for $4.9 million.  (Dkt. No. 90-5 at 17.)  But by July 2012, once that deal had fallen through, Plaintiff and DTV were in talks regarding the purchase of WPHA, and Plaintiff had begun its due diligence of the station.  (*See id.* at 23-24.)  Both parties retained counsel to represent them in the course of the diligence process and sale transaction: Plaintiff retained Wilkinson Barker Knauer, chiefly Jonathan Cohen (Dkt. No. 92 ¶ 3), while DTV engaged the counsel of Peter Tannenwald (Dkt. No. 88-3 ¶ 1.)

## A.     DTV's Pre-Agreement Federal Communication Commission Contacts

No television broadcast station, such as WPHA, may operate without a license granted by the Federal Communications Commission ("FCC").  47 U.S.C. § 301; *FCC v. Nat'l Citizens for Broad.*, 436 U.S. 775, 780 (1978).  Pursuant to that licensing authority, the FCC has enacted numerous rules and regulations for such stations.  Several of those regulations, and whether DTV complied with them, are at issue in the pending motions.

---

[1] "A spectrum auction is a process whereby a government uses an auction system to sell the rights (licenses) to transmit signals over specific bands of the electromagnetic spectrum[.]"  *Spectrum Auction*, Wikipedia, https://en.wikipedia.org/wiki/Spectrum_auction (last visited Aug. 24, 2015).  "Specifically, the first ever incentive auction of television broadcast spectrum will permit television broadcasters to voluntarily go off the air, share their spectrum or move channels in exchange for receiving part of the proceeds from auctioning that spectrum to wireless providers to support [21st] century wireless broadband needs."  *A Groundbreaking Event for the Broadcast Television, Mobile Wireless, & Technology Sectors of the U.S. Economy*, FCC.gov, http://wireless.fcc.gov/incentiveauctions/learn-program/ (last visited Aug. 24, 2015).

[2] Page numbers throughout refer to those that the Court's electronic filing system automatically assign.

2

1        1.    <u>Main Studio Rule</u>

2        FCC regulations require that all broadcast television stations maintain a main studio.  47

3    C.F.R. § 73.1125(a).  The FCC imposes certain staffing and access requirements on these main

4    studios; specifically, there is a two-employee rule that requires a station's main studio to have

5    "management and staff presence on a full-time basis during normal business hours[.]"  *Alpine*

6    *Broad. Ltd P'ship*, 21 FCC Rcd. 3077, 3079 (2006) (internal quotation marks and citation

7    omitted); *Jones Eastern of the Outer Banks, Inc.*, 6 FCC Rcd. 3615, 3616 n.2 (1991), *clarified  at*

8    7 FCC Rcd 6800 (1992).

9        During the summer and fall of 2011, DTV hired William West as WPHA's manager

10   responsible for staffing the Station and granting access to members of the public and FCC

11   inspectors.  (*See* Dkt. No. 90-6 at 9-10; Dkt. No. 88-1 at 96.)  The "main studio" was located at

12   West's home production studio adjacent to West's home behind a locked gate with a buzzer

13   marked with the Station's name.  (Dkt. No. 90-6 at 11, Dkt. No. 88-1 at 97.)  As West put it, his

14   role was "[holding] the public file"—*i.e.*, keeping the Station's records open for access.  (*See* Dkt.

15   No. 88-1 at 96.)  West received an hourly wage for his role as manager, and he did not employ any

16   other individuals to work on DTV's behalf.  (Dkt. No. 90-6 at 12-13.)  However, West would

17   sometimes call upon a "second employee" to fill in for him as backup if he had to leave the studio.

18   (*Id*.)  These backup employees would have been paid by DTV, not West.  (*Id.* at 13-14.)  Weigner

19   testified that there were other individuals working at WPHA during that time period, but noted

20   that he did not pay a second employee at the Station's main studio until 2012.  (*Id.* at 23- 24.)

21       2.    <u>FCC Inspection Rule</u>

22        FCC regulations also require "[t]he licensee of a broadcast station [to] make the station

23   available for inspection by representatives of the FCC during the station's business hours, or at

24   any time it is in operation."  47 C.F.R. § 73.1225(a).

25        On August 17, 2011, an FCC field agent inspector came to the Station to request access.

26   (Dkt. No. 88-1 at 97.)  West came to the gate to speak with the inspector.  (*Id.*)  According to

27   West, he was suffering from an extremely high fever and was leaving to seek emergency medical

28   treatment and told the FCC inspectors as much and, accordingly, could not allow them into the

United States District Court<br>Northern District of California

1    studio.  (*Id.* at 98.)  To the best of West's recollection, the FCC inspectors agreed to come back—

2    either the following day or some other time.  (*Id.*; Dkt. No. 90-6 at 17.)  On September 30, 2011,

3    FCC agents returned to the Station to request access.  (Dkt. No. 88-1 at 100.)  West testified that

4    the inspectors arrived before business hours, so he asked them to wait 15 to 20 minutes for him to

5    come down and open the gate for access and inspection of the Station, but when West returned to

6    the gate at 9:00 am, the inspectors had left.  (*Id.* at 100-101.)  On each of these two occasions, the

7    FCC inspector called Weigner after the failed inspection and left a message requesting a call back

8    to discuss the failed inspections.  (Dkt. No. 88-2 ¶ 6.)  Weigner did not call back.  (*Id.*)  Instead,

9    his attorney, Tannenwald, emailed the inspector after the second visit.  (*Id.* ¶¶ 6-7; Dkt. No. 88-1

10   at 116).  Tannenwald never received a response to his email.  (Dkt. No. 88-1 at 116.)

            3.    Operation per Station Authorization Rule

12          The FCC requires all stations to operate from an authorized antenna structure "and in

13   accordance with the terms of the station authorization."  47 C.F.R. § 73.1350(a).  FCC inspectors

14   used direction-finding equipment "to locate the source of the transmissions" from WPHA, and

15   determined that the Station's broadcast antenna was two tenths of a mile away from its authorized

16   location within the same large cluster of transmission towers.  (Dkt. No. 90-2 at 3-4.)  When DTV

17   learned of this discrepancy in March 2012, it filed an application to change the license consistent

18   with the current antenna location.  (Dkt. No. 88-2 ¶¶ 9-10.)  The FCC approved the application

19   within two weeks.  (*Id.* ¶ 10.)

            4.    Rule Requiring Timely Filing of Children's Programming

21          FCC regulations also require television broadcast stations to submit and make publicly

22   available standardized reports each quarter documenting the station's children's programming.  47

23   C.F.R. § 73.3526(e)(11)(iii).  In 2012, the FCC raised an issue with DTV regarding the filing of

24   WPHA's children's programming reports.  (Dkt. No. 88-2 ¶ 11.)

**B.    The Parties' Purchase Agreement**

26          On October 26, 2012, the parties executed an agreement (the "Purchase Agreement")

27   whereby DTV would sell the principal assets of the Station on the closing date in exchange for

28   $6.4 million.  (Dkt. No. 90-1 at 2-25 (hereinafter "Purchase Agreement").)  Plaintiff would also

United States District Court
Northern District of California

4

United States District Court
Northern District of California

1    pay DTV a $5,000 signing bonus.  (*See id.* § 1.3(c).)  The Purchase Agreement was based on a

2    contract that DTV had used in another transaction, and DTV drafted its provisions.  (Dkt. No. 91

3    ¶ 18; Dkt. No. 92 ¶ 12; *see also* Dkt. No. 90-2 at 11 (DTV's other purchase agreement).)

4         Under the Purchase Agreement's terms, the parties agreed to file an application to seek

5    FCC consent to the transfer of the Station to Plaintiff within five business days of signing.  (*Id.*

6    § 5.1.)  The sale of the Station would occur within 10 business days after the FCC grant of its

7    consent to assignment of the Class A license to Plaintiff.  (*Id.* § 4.)

8         1.    *Provisions Regarding FCC Consent*

9         In the Purchase Agreement, the parties made representations regarding their

10   responsibilities for obtaining that consent.  Specifically, both parties agreed to "diligently

11   prosecute the FCC Application and otherwise use their best efforts to obtain the FCC Consent as

12   soon as practicable, provided, however, that neither party shall be required to participate in a trial-

13   type hearing or judicial appeal."  (*Id.* § 5.1.)  The parties contracted to "cooperate with the FCC in

14   connection with obtaining the FCC Consent," and agreed to "promptly provide all information and

15   documents requested by the FCC in connection therewith."  (*Id.* § 5.2.)  Likewise, both parties

16   agreed to "cooperate fully with the other in taking any commercially reasonable actions (including

17   to obtain the required consent of any governmental instrumentality or any third party) necessary to

18   accomplish the transactions contemplated by this Agreement, including, but not limited to, the

19   prompt satisfaction of any condition to the Closing set forth herein."  (*Id.* § 9.1.)

20        2.    *DTV's Representations and Warranties*

21        The FCC will not consent to a license assignment if the Station is the subject of ongoing

22   enforcement proceedings arising from regulatory violations.  *See Expanding the Economic &*

23   *Innovation Opportunities of Spectrum Through Incentive Auctions*, 29 FCC Rcd. 6567, 6719-20 &

24   n. 1061 (2014) (citations omitted).  (*See also* Dkt. No. 91 ¶¶ 12-13.)  In one section of the

25   Purchase Agreement, DTV made a variety of representations and warranties to Plaintiff about the

26   status of such violations or proceedings.  (Purchase Agreement Art. 7.)

27        In Section 7.4(c), DTV represented that "[t]he Station has been at all times during the

28   current license term, and will be between the date of this Agreement until the Closing Date,

5

1    operating in compliance with the terms and conditions of the FCC Licenses, the Communications

2    Act and the current rules, regulations and policies of the FCC applicable to the Station in all

3    material respects."

4          In Section 7.10, DTV warranted that "[t]here are no suits, arbitrations, administrative

5    charge or other legal proceedings, claims or governmental investigations pending against, or to

6    [DTV]'s knowledge, threatened against, [DTV] relating to or affecting this Agreement or the

7    transactions contemplated hereby or the Station Assets, nor, to [DTV]'s knowledge, is there any

8    basis for any such suit, arbitration, administrative charge, or other legal proceeding, claim or

9    governmental investigation."

10         3.    *Termination and Remedy Provisions*

11         The Purchase Agreement provided for termination "by written notice of Seller to Buyer, or

12   Buyer to Seller, on or after September 1, 2013, if the Closing shall not have been consummated on

13   or before the date of such notice."  (*Id.* § 15.1(e).)  Although Plaintiff initially proposed a later

14   date and DTV an earlier one (Dkt. No. 88-2 ¶ 4), they eventually agreed to September 1, which

15   gave the parties ten months to complete the transaction before the termination option became

16   effective.  By way of reference, the FCC typically approves an application in 2-3 months.  (Dkt.

17   No. 91 ¶ 5.)  In fact, Plaintiff has closed on thirteen other stations in an average of 90 days, with

18   no deal taking eight months to close.  (Dkt. No. 92 ¶ 5.)  According to Weigner, such termination

19   options are regularly included in station transactions because the value of the assets is likely to

20   fluctuate due to uncertainty in government policies that may affect licensing approval.  (Dkt. No.

21   88-2 ¶ 2.)  In addition, Weigner avers that earlier drafts of the Purchase Agreement limited the

22   termination right such that it could be exercised only "if the party giving notice is not materially at

23   fault for the delay[,]" but DTV would not agree to that limitation.  (*Id.* ¶¶ 3-4.)

24         The Purchase Agreement also provided that "termination . . . shall not relieve any party of

25   any liability for breach or default under this Agreement prior to the date of termination."

26   (Purchase Agreement § 15.2(a).)  Section 15.2(b) further provided that if DTV breaches the

27   Purchase Agreement, then Plaintiff may "bring an action for specific performance" and DTV

28   "acknowledges that the Station is a unique asset that cannot be readily replaced on the open

United States District Court
Northern District of California

market and that [Plaintiff] will be irreparably injured if this Agreement is breached[,]" and therefore DTV "shall not interpose any opposition, legal or otherwise, as to the propriety of specific performance or injunctive relief as a remedy for Buyer."

**C.     Parties' Conduct Subsequent to Execution of the Purchase Agreement**

The parties filed their assignment application with the FCC's Media Bureau Video Division on November 2, 2012.  (Dkt. No. 91 ¶ 23.)  The FCC issued a public notice accepting the application on November 7, 2012, and set a deadline for public comments of December 7, 2012.  (*Id.*)  No comments were filed.  (*Id.*)  There is no required timeframe—either statutory, regulatory, or otherwise—for FCC decisions on license assignments.  (Dkt. No. 96-2 ¶ 13.)  Nevertheless, hearing no response, DTV's attorney, Tannenwald, noted in a January 16, 2013 email to Plaintiff's counsel that there were "two things holding up" the assignment: WPHA's Class A compliance letter inquiry from the FCC, and the FCC "Enforcement Bureau['s] investigation of main studio compliance[.]"  (Dkt. No. 90-6 at 2.)

On February 7, 2013, both parties' counsel met with the FCC Media Bureau's Video Division to discuss the status of the FCC consent to assignment.  (Dkt. No. 91 ¶¶ 14, 25.)  At that meeting, the FCC stated that it would not approve the assignment to Plaintiff until it decided whether to take action against DTV for not permitting the inspections in 2011, among other possible violations.  (Dkt. No. 91 ¶ 25.)  DTV insists that this meeting was the first time it learned that the FCC was concerned with those incidents.  (Dkt. No. 88-2 ¶ 15; Dkt. No. 88-3 ¶ 2.)

DTV submitted a memorandum to the FCC on May 23, 2013, which described itself as a "preliminary discussion of regulatory compliance issues" facing WPHA.  (Dkt. No. 88-1 at 112-13.)  The May 23 submission does not present facts relating to the main studio inspection attempts; instead it argues generally that the Station's compliance record regarding the children's programming reports did not warrant a downgrade from Class A status, but at most a Notice of Apparent Liability or consent decree that would allow the sale to Plaintiff to move forward.  (*Id.*)

About two months later, on July 11, 2013, the FCC issued a "Notice of Apparent Liability for Forfeiture."  (Dkt. No. 90-1 at 27.)  The Notice found that DTV "failed to file Children's Television Programming reports [for WPHA] in a timely manner for 15 quarters since the last

license renewal." (*Id.*)  The FCC ordered DTV to pay $9,000.00 "for its apparent willful and repeated violations" of FCC rules.  (*Id.* at 28.)  DTV did not pay the fine until after it terminated the Purchase Agreement.[3]

DTV's next formal submission to the FCC Enforcement Bureau came on August 15, 2013. The August 15 submission addresses the attempted Station inspections, as well as the unauthorized antenna location, and "focus[es] on the issue of whether the licensee resisted an FCC agent's attempt to inspect station facilities . . . and if so, what remedy would be appropriate[.]" (Dkt. No. 88-1 at 114-118.)  The August 15 submission expresses DTV's position that, during the first inspection attempt, the FCC inspector agreed to come back the following day and during the second, the inspector arrived before business hours.  (*Id.* at 116-117.)

In the meantime, as the September 1 termination-option deadline was approaching, Plaintiff's counsel requested a meeting with the FCC's Enforcement Bureau to see if there was anything that could be done to hasten the consent approval process.[4]  (*See* Dkt. No. 91-4 at 5-6.) On August 24, 2013, Plaintiff prepared the closing documents and waived all conditions to closing.  (Dkt. No. 91 ¶ 36.)  That same day, Plaintiff agreed not to exercise the termination option if the FCC had not provided consent for the assignment application by September 1, and requested that DTV do the same.  (*Id.*; Dkt. No. 91-4 at 8-9.)  DTV refused that request.  (*See* Dkt. No. 91 ¶ 37.)  On August 28, 2013, Plaintiff's counsel learned from the FCC Enforcement Bureau that the enforcement investigation regarding the failed inspections would not be completed by September 1.  (*Id.* ¶ 37.)  September 1, 2013 came and went without DTV resolving the July 2013 Notice of Apparent Liability imposing the $9,000 fine or with any action from the FCC on the failed inspections.  (*See* Dkt. No. 88-2 ¶ 17.)  The FCC also did not take any action to approve the transfer of the license to Plaintiff.

On March 11, 2014, DTV invoked the termination option pursuant to Section 15.1(e),

---

[3] The summary judgment record does not indicate when DTV paid the $9,000 fine for the children's programming reports issue.  (*See* Dkt. No. 96-3 ¶ 8.)  At oral argument, however, the parties agreed that DTV did not pay that amount until after it had terminated the Purchase Agreement.

[4] There is no indication in the record that any such meeting occurred.

8

backing out of the Purchase Agreement.  (*Id.*)  Plaintiff filed this lawsuit days later.  (*See* Dkt. No. 1.)

One month later, the FCC issued a second Notice of Apparent Liability.  (Dkt. No. 90-2 at 2-9.)  The FCC found that in August and September 2011, DTV willfully and repeatedly violated FCC Rules "by refusing to make the Station available for inspection by an FCC agent."  (*Id.* at 5.)  The FCC also found that DTV violated the main studio rule "by failing to maintain a full-time management and staff presence at the Station's main studio during regular business hours" and failed to operate the Station in accordance with the Station's authorization by having its antenna operate from an unauthorized location since 2004.  (*Id.* at 6.)  For the main studio violation the FCC imposed a fine of $7,000, and for the unauthorized location of the antenna a fine of $7,200.  (*Id.* at 8.)  For the failure to allow the FCC agents to inspect the Station, the FCC imposed a forfeiture of $75,000, the statutory maximum of $37,500 for each failure to allow inspection.  (*Id.*)  The FCC wrote:

> This is simply unacceptable. . . . D.T.V. and its sole principal are well aware of the Commission's rules requiring licensees to make their broadcast stations available for "on-the-spot" inspections at the request of FCC agents. . . . D.T.V.'s actions exhibited a blatant disregard of and contempt for the Commission's authority.

(*Id.* at 7.)  DTV has not yet paid the forfeiture, and instead has contested both the factual assertions and legal conclusions of the Notice of Apparent Liability.  (Dkt. No. 96-2 ¶ 2.)  DTV did eventually pay the $9,000 forfeiture for the July 2013 Notice of Apparent Liability for the violations regarding reports of children's programming, but did so after exercising its termination right under the Purchase Agreement.  (*See* Dkt. No. 96-3 ¶ 8.)  *See also supra* n.3.  As of the filing of the cross-motions for summary judgment, the FCC still has not approved the assignment of WPHA's Class A license from DTV to Plaintiff.  (Dkt. No. 88-2 ¶ 12.)

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. Proc. 56(a).  The Court must "draw all reasonable inferences . . . and resolve all factual conflicts in favor of the non-moving party."  *Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1138 (9th Cir. 2004).

United States District Court
Northern District of California

A fact is material if it "might affect the outcome of the suit under the governing law," and an issue is genuine if "a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  There can be "no genuine issue as to any material fact" when the moving party shows "a complete failure of proof concerning an essential element of the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When the party moving for summary judgment does not bear the burden of proof at trial (usually the defendant), the party has the burden of producing evidence negating an essential element of each claim on which it seeks judgment or showing that the opposing party cannot produce evidence sufficient to satisfy her burden of proof at trial.  *Nissan Fire & Mar. Ins. Co., Ltd. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  Once the moving party meets that burden, the non-moving party must show that a material factual dispute exists.  *California v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998).  When the party moving for summary judgment would bear the burden of proof at trial (usually the plaintiff), "it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial."  *C.A.R. Transp. Brokerage Co., Inc. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal quotation marks and citation omitted).  "In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case.  Once the moving party comes forward with sufficient evidence, the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense."  *Id.* (internal quotation marks and citation omitted).

Where, as here, the parties cross-move for summary judgment on the same claims (here, the contract claims), the court is required to review the evidence submitted by the parties in support of their own motions and in opposition to the opposing party's motion in deciding each summary judgment motion.  *Fair Hous. Council of Riverside Cnty., Inc., v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).  Further, that both parties move for summary judgment on the same claims does not mean that the facts are undisputed; rather, the court must independently evaluate whether a dispute of fact exists which defeats either summary judgment motion.  *Id.*

United States District Court
Northern District of California

# DISCUSSION

**A.      Admissibility of the FCC Notices of Apparent Liability**

As a preliminary matter, the Court must decide whether to admit as evidence the facts set forth in the July 2013 and April 2014 Notices of Apparent Liability as Plaintiff relies on those documents in support of its motion for summary judgment.  Federal Rule of Evidence 803(8) provides that in a civil case, such as this, "factual findings from a legally authorized investigation" are not excluded as hearsay unless the opposing party "show[s] that the source of information or other circumstances indicate a lack of trustworthiness."  Fed. R. Evid. 803(8)(A)(iii), (B). "[P]ortions of investigatory reports otherwise admissible under Rule [803(8)] are not inadmissible merely because they state a conclusion or opinion."[5]  *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 170 (1988).  The Notices of Apparent Liability indisputably resulted from a legally authorized investigation of the FCC; thus, the findings are admissible unless DTV shows a lack of trustworthiness.  *See Johnson v. City of Pleasanton*, 982 F.2d 350, 352 (9th Cir. 1992) ("A party opposing the introduction of a public record bears the burden of coming forward with enough negative factors to persuade a court that a report should not be admitted.") (citation omitted).

The factors relevant to the trial court's trustworthiness inquiry include "(1) the timeliness of the investigation; (2) the investigator's skill or experience; (3) whether a hearing was held; and (4) possible bias when reports are prepared with a view to possible litigation." *Sullivan v. Dollar Tree Stores, Inc.*, 623 F.3d 770, 778 (9th Cir. 2010) (quoting *Beech Aircraft Corp.*, 488 U.S. at 167 n. 11).  The Court finds that DTV has not met its burden of showing that the FCC's findings are untrustworthy such that they should not be admitted on summary judgment.

First, the Court does not find that the FCC investigation was untimely; indeed, the record is silent as to when the author(s) of the Notices of Apparent Liability communicated with the FCC agents who had first-hand knowledge of the missed inspections and main office violation.  And

---

[5] The *Beech Aircraft Corp.* case referred to Federal Rule of Evidence 803(8)(C), the predecessor to the current rule, which was adopted in 2011.  The Advisory Committee notes to the rule indicate that the changes to Rule 803(8) "are intended to be stylistic only" and do not "change any result in any ruling or evidence admissibility."  Adv. Comm. Notes to Fed. R. Evid. 803. Accordingly, the deletion of Rule 803(8)(C) does not change the outcome of *Beech Aircraft Corp.*, which remains relevant to Rule 803(8)(A) and (B) as currently written.

United States District Court
Northern District of California

1    DTV offers no argument as to why timeliness matters with respect to the late filing of the

2    children's programming reports.

3          Second, the FCC is expert at investigating violations of its own Rules; indeed, no other

4    agency would have greater expertise.

5          Third, while no oral hearing was held, the FCC met with DTV and gave it the opportunity

6    to respond to the violation allegations, which it did in writing through its attorney in May 2013

7    and August 2013.

8          Fourth, DTV does not identify any possible bias against it by the FCC.  To find

9    disqualifying bias on this record would mean that all investigative reports by an agency into

10   violations of its own rules would be inadmissible.  Nothing in the caselaw supports that

11   interpretation.

12         Finally, the factual findings that are material to Plaintiff's motion involve circumstances to

13   which DTV has personal knowledge.  If DTV believes a finding is inaccurate, all it has to do is

14   submit a declaration or deposition testimony contradicting the factual finding set forth in the

15   Notices of Apparent Liability.  If it has done so, the Court will and must assume that fact in favor

16   of DTV (at least on Plaintiff's motion for summary judgment).  *See Schwenk v. Hartford*, 204 F.3d

17   1187, 1196 (9th Cir. 2000) (noting that, on summary judgment, the court "assume[s] the version of

18   the material facts asserted by the non-moving party to be correct").  For all the above reasons, the

19   Court in its discretion finds the facts in the Notices of Apparent Liability upon which the Court

20   relies in this Order are admissible.[6]

21   **B.     First Cause of Action: Breach of Contract**

22         Both parties seek summary judgment on the breach of contract claim, albeit on different

23   theories of breach.  Plaintiff seeks judgment in its favor for breach of what it characterizes as

24   express contractual warranties—*i.e.*, DTV's allegedly false representations in the Purchase

25   Agreement about its compliance with FCC regulations.  DTV, for its part, seeks summary

26

27   ───────────────
     [6] Plaintiff sought to depose the relevant FCC employees, but the FCC declined on the grounds,
     among others, that the FCC's written findings are admissible.  (Dkt. No. 104.)

28

1  judgment for Plaintiff's breach of contract claim on the grounds that there is no genuine dispute

2  that DTV used its "best efforts" to obtain FCC consent for the assignment.  If the Court concludes

3  that DTV breached the Purchase Agreement as a matter of law, the parties also dispute whether

4  specific performance is warranted.[7]

5      1.  *Legal Standard*

6          "Under Delaware law, the elements of a breach of contract claim are: 1) a contractual

7  obligation; 2) a breach of that obligation by defendant; and 3) a resulting damage to plaintiff."  *H-*

8  *M Wexford LLC v. Encorp., Inc.*, 832 A.2d 129, 140 (Del. Ch. May 27, 2003) (citation omitted);

9  *see also In re G-I Holdings*, 755 F.3d 195, 202 (9th Cir. 2014) (same) (citation omitted).[8]  Only

10  material breaches are actionable.  "Materiality goes to the essence of the contract; a breach is

11  material if it will deprive the injured party of the benefit that is justifiably expected under the

12  contract."  *Gen. Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 315 (3d Cir. 2001)

13  (internal quotation marks and citation omitted).  With respect to the damages element, "in order to

14  recover damages from a defendant for breach of contract, [a plaintiff] must demonstrate with

15  *reasonable certainty* that defendant's breach caused the loss."  *Tanner v. Exxon Corp.*, No. 79C-

16  JA-5, 1981 WL 191389, at *1 (Del. Super. Ct. July 23, 1981) (citations omitted).  However,

17  "reasonably certainty" does not mean "absolute certainty."  *Id.*  Rather, "reasonable certainty"

18  means only "that the fact of damages must be taken out of the area of speculation."  *Id.*  Put

19  another way, to prove damages, "a plaintiff must show both the existence of damages provable to

20  a reasonable certainty, and that the damages flowed from the defendant's violation of the

21  contract."  *eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, C.A. No. 7471-VCP, 2013 WL

22  5621678, at *13 (Del. Ch. Sept. 30, 2013) (footnote omitted).  A plaintiff must prove its damages

23  by a preponderance of the evidence.  *Id.* (footnote omitted).

24

25  [7] In its motion, Plaintiff also requested that the Court interpret two provisions of the Purchase
26  Agreement—Sections 15.1(e) and 15.2—to mean that, even once DTV terminates the Purchase
   Agreement, DTV remains liable for breaches that occurred prior to termination.  (*See* Dkt. No. 94
27  at 25-27.)  DTV did not oppose that argument, and the Court agrees with Plaintiff's interpretation.

28  [8] The parties have agreed that for the purposes of the instant motions for summary judgment,
   Delaware law applies.

2.    *Plaintiff's Motion: Breach of Express Contractual Representations and Warranties*

      i.    The contractual obligation

Plaintiff frames at least part of the breach of contract claim as breach of express representations and warranties, which can serve as the basis for a breach of contract claim under Delaware law.  *See, e.g.*, *Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 823-24 (Del. 2013); *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, Civ. A. No. 5140-CS, 2012 WL 3201139, at *17 (Del. Ch. Aug. 7, 2012).  Specifically, Delaware courts view this particular type of contractual cause of action as "serv[ing] an important risk allocation function . . . plac[ing] the risk that [the seller's] . . . statements were false and that [the seller] was operating in an illegal manner on [the seller]."  *Univ. Enter. Grp., LP v. Duncan Petroleum Corp.*, C.A. No. 4948-VCL, 2013 WL 3353743, at *17 (Del. Ch. July 1, 2013) (third, fourth, and fifth alterations in original) (citations omitted).[9]

Without citing any authority, DTV urges that there is no cause of action for breach of contractual warranties, and that Delaware courts consider misrepresentations of the current state of facts—even when the representation appears in the parties' contract—only as fraudulent inducement claims.  Not so.  For example, in *Universal Enterprise Group, L.P. v. Duncan Petroleum Corp.*, C.A. No. 4948-VCL, 2013 WL 3353743, at *12 (Del. Ch. July 1, 2013), the plaintiffs alleged that the defendants made factual misrepresentations in the parties' purchase agreement regarding the current state of their business.  The plaintiffs sued for both fraud and breach of contract.  The court granted judgment in defendant's favor on the fraud claim, finding that the plaintiffs had failed to prove reliance, but held that the plaintiffs prevailed on the breach of contract claim because "plaintiffs proved that the defendants' false representations breached the contract and resulted in actual damages[,]" and reliance was not an element of that cause of action.

---

[9] Delaware rules allow citation to unpublished cases from the Delaware Court of Chancery and Delaware Superior Court.  *See, e.g.*, Del. Super. Ct. R. Civ. P. 107(g); Del. Ch. Ct. R. Civ. P. 171(i).  While these cases are "not necessarily *stare decisis*," they nevertheless warrant "great deference" when considering actually similar circumstances.  *Aprahamian v. HBO & Co.*, 531 A.2d 1204, 1207 (Del. Ch. 1987) (citing *State v. Phillips*, 400 A.2d 299, 304 (Del. 1979)); *see also In re Bridgepoint Educ., Inc. Shareholder Deriv. Litig.*, No. 13-cv-2947 JM (JLB), 2014 WL 5325711, at 11 n.5 (S.D. Cal. Oct. 17, 2014) (same).

United States District Court
Northern District of California

1   *Id.* at *1.  Other Delaware courts have similarly recognized breach of factual representations as a

2   cognizable claim.  *See, e.g.*, *Cobalt Operating, LLC v. James Crystal Enters., LLC*, No. Civ. A.

3   714-VCS, 2007 WL 2142926, at *4 (Del. Ch. July 20, 2007) (granting judgment in favor of

4   plaintiff on both fraud and breach of contract based on defendant's misrepresentations in asset

5   purchase agreement that its radio station was making more per year in profit than it actually was).

6                  ii.      The breach

7        Plaintiff contends that certain of DTV's Purchase Agreement warranties were false when

8   made: Sections 7.4(c) and 7.10.  DTV warranted in Section 7.10, entitled "<u>Absence of Litigation</u>,"

9   that, among the absence of other things, "[t]here are no . . . legal proceedings, claims or

10  governmental investigations" pending against DTV "relating to or affecting . . . the transaction

11  contemplated [by [the Purchase Agreement.]"  Section 7.10 also warranted that "nor, to [DTV]'s

12  knowledge, is there a basis for any . . . legal proceeding, claim or governmental investigation."  In

13  Section 7.4(c), DTV warranted that "[t]he Station had been at all times during the current license

14  term, and will be between the date of this Agreement until the Closing Date, operating in

15  compliance with the terms and conditions of the FCC Licenses, the Communications act and the

16  current rules, regulations and policies of the FCC  applicable to the Station in all material

17  respects."  (Dkt. No. 90-1 at 8.)  The first question, then, is whether a reasonable trier of fact

18  would have to find that as of October 2012—when the Purchase Agreement was executed—

19  DTV's representations were false.  The answer is "yes."

20       ***The false warranties***

21       A reasonable trier of fact would have to find that at the time DTV executed the Purchase

22  Agreement it was not in compliance with FCC rules governing children's programming reports

23  and that the FCC had initiated an investigation into the untimely reports.

24       DTV admits that in March 2012 the FCC raised the issue of the timeliness of the children's

25  programming reports with DTV.  (Dkt. No. 88-2 ¶ 11.)  DTV also admits that at least some of its

26  children's programming reports were submitted late.  (Dkt. No. 96-3 ¶ 8.)  In the July 2013 Notice

27  of Apparent Liability the FCC found that DTV "failed to file Children's Television Programming

28  reports in a timely manner for 15 quarters since the last license renewal."  (Dkt. No. 90-1 at 27.)

15

United States District Court
Northern District of California

1   DTV did not challenge the Notice of Apparent Liability and instead paid the $9,000 forfeiture.

2   (Dkt. No. 96-3 ¶ 8.)  Based on these undisputed facts a reasonable trier of fact would have to find

3   that as of October 2012 DTV knew the basis for an FCC investigation into late-filed children's

4   programming reports (that is, that it in fact had filed late reports) and, indeed, knew that the FCC

5   was investigating the filing of late reports because the FCC inquired of DTV about the late reports

6   before the Purchase Agreement was signed.  Thus, the representation that there was no

7   governmental investigation into DTV was false as was its representation that it did not know of

8   the basis for any investigation.  DTV's representation that it was in compliance with all FCC rules

9   and regulations was similarly false.

10          DTV's insistence that Mr. Weigner told Plaintiff about the FCC's children's programming

11  inquiry (Dkt. No. 88-2 ¶ 11) does not create a genuine dispute as to whether the written warranty

12  was false.  Even if Plaintiff knew it was false, it was still false.  To prevail on its breach of contract

13  claim Plaintiff does not have to prove reasonable reliance.  *See Univ. Enter. Grp., L.P.*, 2013 WL

14  3353743, at *17.

15          A reasonable trier of fact would also be compelled to find that DTV knew the basis for a

16  governmental investigation involving the failed inspections.  The facts set forth in the April 2014

17  Notice of Apparent Liability set forth the basis for that investigation and DTV's knowledge of

18  those facts.  DTV does not materially dispute those facts.  Instead, Mr. West, the Station Manager,

19  attests that during the August 2011 visit he had a high fever and thus it was urgent that he go to the

20  doctor, and that he believed the agents were going to return the next day.  (Dkt. No. 90-6 at 16-

21  17.)  And Mr. Weigner testifies that he had his attorney respond to the agents' September 2011

22  voicemail, and the attorney, Mr. Tannenwald, states that he sent an email to the FCC inspector and

23  received no response.  (Dkt. No. 88-2 ¶¶ 6-7; Dkt. No. 88-1 at 116.)

24          DTV does not dispute that when the agents spoke in person with Mr. West in August 2011,

25  and Mr. West reported that he would not allow the agents to inspect the studio because he had to

26  go to the doctor, the agents advised him that the main studio must be accessible to the general

27  public and staffed according to FCC requirements.  (Dkt. No. 90-2 at 2-3.)  DTV does not dispute

28  that the agents left a voicemail for Mr. Weigner reporting that the studio was inaccessible to the

16

1   public and that the Station Manager had failed to permit an inspection.  (*Id.*)  DTV does not

2   dispute that Mr. Weigner never responded to that voicemail, whether himself or through his

3   attorney.

4         DTV also admits that on September 30, 2011, the FCC agents returned to the Station

5   between 8:40 a.m. and 8:50 a.m. and that the studio was inaccessible because the gate across the

6   driveway was locked.  DTV does not dispute that when Mr. West came to the gate, he did not

7   unlock the gate and instead asked the agents to wait; that the agents waited for approximately 10

8   minutes and, when Mr. West did not return, the agents left. (Dkt. No. 96-1 at 18-19.)  The agents

9   spoke by telephone with the Station Manager that afternoon and advised him that the locked gate

10   prevented the main studio from being made available for inspection, and left a voicemail for Mr.

11   Weigner advising him that the main studio remained in accessible to the public because of the

12   locked gate and asking for a return call.  (Dkt. No. 88-2 ¶¶ 6-7; Dkt. No. 88-1 at 116.)

13         Finally, it is undisputed that the FCC did at some point initiate an investigation into the

14   August and September 2011 failed inspections, and that the investigation was based upon the

15   above undisputed facts.[10]  The record thus compels the conclusion that at the time of the execution

16   of the October 2012 Purchase Agreement DTV had knowledge of the basis of an FCC

17   investigation into the Station, rendering its warranties to the contrary false.

18                 iii.    Materiality

19         That DTV breached at least some of the warranties, however, does not end the inquiry; to

20   prevail Plaintiff must establish that the breaches were material as a matter of law.  While

21   ordinarily whether breach is material is a question of fact, where the facts are undisputed and only

22   one conclusion can be drawn from those facts, materiality can be decided as a matter of law.  *See*

23   *Saienni v. G & C Capital Grp., Inc.*, No. 96C-07-151, 1997 WL 363919, at *3 (Del. Super. Ct.

24   _____

25   [10] On the record before the Court, there is at least a dispute as to whether the inspections
themselves constitute an FCC "investigation" within the meaning of sections 7.10 and 7.4 of the

26   Purchase Agreement as a matter of law.  The FCC itself appears to characterize such inspections
as "periodic inspections by its field agents to verify regulate compliance" (Dkt. No. 90-2 at 5),

27   rather than an investigation initiated because of a suspicion or report of a violation.  Thus, the
Court declines to grant Plaintiff's motion to the extent it seeks a ruling that the FCC had begun its

28   investigation of the studio inspection apparent violation by October 2012 and therefore DTV
breached its warranty that there were no investigations.

United States District Court
Northern District of California

1    May 1, 1997); *Norfolk S. Ry. Co. v. Basell USA Inc.*, 512 F.3d 86, 92-93 (3d Cir. 2008) (applying

2    Delaware law and stating that "in certain situations, it can be appropriate to determine the issue of

3    material breach at the summary judgment stage") (footnote omitted).  So it is here.

4         "Delaware courts have consistently looked to the *Restatement (Second) of Contracts* to

5    guide their material breach determinations."  *Norfolk S. Ry. Co*, 512 F.3d at 92 (collecting

6    Delaware state court cases).  Following the Restatement, Delaware courts consider five factors in

7    evaluating whether a breach is material: (1) the extent to which the injured party will be deprived

8    of the benefit it reasonably expected; (2) the extent to which the injured party can be adequately

9    compensated for part of the benefit of which it will be deprived; (3) the extent to which the party

10   failing to perform will suffer forfeiture; (4) the likelihood that the party failing to perform will

11   cure its failure; and (5) the extent to which the behavior of the party failing to perform comports

12   with standards of good faith and fair dealing.  *Restatement (Second) of Contracts* § 241 (1981);

13   *see also Norfolk S. Ry. Co.*, 512 F.3d at 92 (applying Delaware law).  All of these factors compel a

14   conclusion that DTV's breach was material as a matter of law.

15        First, a reasonable trier of fact must find that due to DTV's untrue warranties, Plaintiff was

16   deprived of the purchase of the Station.  The Purchase Agreement gave the parties 10 months to

17   obtain FCC consent and close the sale.  On 13 different occasions Plaintiff has received such

18   consent in 90 days or less.  (Dkt. No. 92 ¶ 5).   It is FCC policy to withhold consent to the

19   assignment of licenses until enforcement proceedings against the current license holder have been

20   resolved.  (Dkt. No. 91 at ¶ 13.)  And, DTV repeatedly admitted that FCC consent to the

21   assignment of the Station to Plaintiff was being held up by the unresolved issues involving the

22   children's programming reports and the main studio failed inspections, among other issues.  (Dkt.

23   No. 91-1 at 13, 15, 17; Dkt. No. 91-3 at 3; Dkt. No. 90-4 at 12.)  Indeed, DTV, through its attorney

24   Tannenwald, attests that in February 2013 it learned that the FCC "would not approve a sale of the

25   Station to [Plaintiff] until its [FCC's] concerns with [the] inspections was resolved."  (Dkt. No.88-

26   3 ¶ 2).  The only inference to be drawn from these undisputed facts is that the FCC has, to this

27   day, not approved the transfer of the license because the issue of DTV's violations of the main

28   studio rule and inspection requirements have not been resolved.

United States District Court
Northern District of California

DTV's only response is that because no regulation requires the FCC to act on a request for consent to assignment of a license, there is dispute as to whether the delay in the FCC's consent is because of unresolved violations. In other words, DTV insists that Plaintiff cannot demonstrate causation. (*See* Dkt. No. 96 at 19-20.) The short answer is that there is not a scintilla of evidence in the record that suggests that the FCC approval is being held up by anything other than DTV's unresolved apparent violations—as DTV has itself acknowledged on several occasions. DTV's argument is tantamount to asserting that because a stoplight can be red or green, whether it was red is always a disputed issue of fact even if all the evidence in record supports only the inference that it was red. A party cannot avoid summary judgment so easily. Thus, the first materiality factor supports a finding of materiality.

The remaining materiality factors also compel a finding that DTV's breach of the warranties was material. Plaintiff can be adequately compensated for its injury—deprivation of the Station—by DTV resolving the apparent violations and thus obtaining FCC consent. DTV will not suffer any forfeiture; it will merely be required to sell the Station for what it agreed was an appropriate purchase price. DTV's conduct thus far demonstrates that it will not voluntarily cure its default; further, the conduct also does not comport with good faith and fair dealing. Having misrepresented the status of the Station's relationship with the FCC vis-à-vis compliance issues, even if unintentionally, good faith would suggest that DTV would not take advantage of the delay occasioned by its misrepresentation to back out of its agreement. In sum, the undisputed facts and consideration of the materiality factors compel a finding that DTV's breaches were material.

DTV's insistence that the breaches were merely technical is belied by the undisputed facts recited above. It is also worth noting the children's programming violation led to a forfeiture of $9,000, which DTV paid. And the inspection violations led the FCC to issue a Notice of Apparent Liability imposing the maximum forfeiture allowed by law, $75,000—$37,500 per visit. (*See* Dkt. No. 90-2 at 8.) For each of these reasons, a trier of fact would be compelled to find that DTV's breaches were material.

        iv.    Damages

DTV next contends that, at a minimum, a reasonable factfinder could conclude that either of the alleged breaches did not cause Plaintiff damage.  Plaintiff bears the burden of establishing "both the existence of damages provable to a reasonable certainty, and that the damages flowed from the defendant's violation of the contract."  *eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, C.A. No. 7471-VCP, 2013 WL 5621678, at *13 (Del. Ch. Sept. 30, 2013) (footnote omitted).  As to the first element, Plaintiff has proven the existence of damages as a matter of law: specifically, it is undisputed that Plaintiff spent time and money—including the signing bonus paid to DTV and the tens of thousands of dollars spent attempting to resolve DTV's regulatory complaints to clear the hurdles to FCC consent—that it has now lost without the benefit of having ownership of the Station.  (*See* Dkt. No. 101 ¶ 15.)  And, as to the second element, as explained above, it is undisputed that the FCC would have approved the transfer of the Station before the termination date, and certainly before DTV terminated the Purchase Agreement, if there had not been any FCC investigation of the Station or any basis for initiating an investigation, as DTV warranted.

Causation as a matter of law is further supported by the "prevention doctrine."  "It is an established principle of contract law that '[w]here a party's breach by nonperformance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused.'"  *WaveDivision Holdings, LLC v. Millennium Dig. Media Servs., L.L.C.*, No. C.A. No. 2993-VCS, 2010 WL 3706624, at *14 (Del. Ch. Sept. 17, 2010) (quoting Restatement (Second) of Contracts § 245 and *Moore Bros. Co. v. Brown & Root, Inc.*, 207 F.3d 717, 725 (4th Cir. 2000)); *see also Lesh v. ev3 Inc.*, C.A. No. 05C-05-218 CLS, 2013 WL 2470308, at *4 (Del. Super. Ct. Apr. 15, 2013) (same) (citation omitted).  While this "rule of law is related to the general duty of good faith and fair dealing[,]" *W & G Seaford Assocs., L.P. v. E. Shore Mkts., Inc.*, 714 F. Supp. 1336, 1341 (D. Del. 1989), other courts have recognized it as a way to prove causation in the breach-of-contract context.  *See, e.g.*, *WaveDivision*, 2010 WL 3706624, at *14.  For example, in *WaveDivision Holdings*, the parties had entered a purchase agreement that required, among other things, that the defendant not solicit other purchasers and use best efforts to obtain consent for the transaction from certain lenders.  *WaveDivision*, 2010 WL 3706624, at *14.  The record reflected that the defendant actually engaged in conduct that encouraged a sale to a different buyer—not

plaintiff—and eventually closed on an alternative transaction.  *Id.*  In addressing damages for the plaintiff's breach of contract claim, the Delaware Court of Chancery explained that "it is not necessary that the [lender's] consent would have been given 'but for' [defendant's] conduct, but only that [defendant's] actions contributed materially to the non-consent of the lenders."  *Id.* (citations omitted).  Applying the reasoning of *WaveDivision* here, Plaintiff need not prove that the FCC would have given consent but for DTV's conduct, but only that DTV's conduct "contributed materially" to the non-consent, stymying any hope of effecting the sale.  This finding has been proven indisputably true by DTV's own evidence as a matter of law.

Finally, as a last gasp, DTV insists that because this dispute involves untrue warranties, the proper measure of damages is to evaluate what position Plaintiff would be in if DTV had not made untrue representations.  In other words, that Plaintiff must prove that the parties would have closed the sale if DTV had not made the false warranties and instead had somehow conditioned its warranties with disclosure of the truth.  DTV does not offer any support for this theory which is unsurprising given that it is contrary to Delaware law.  As the *Universal Enterprise Group, L.P.*, court observed, under Delaware law

> representations like the ones made in [the agreement] serve an important risk allocation function.  By obtaining the representations it did, [the buyer] placed the risk that [the seller's] financial statements were false and that [the seller] was operating in an illegal manner on [the seller.]

2013 WL 3353743 at *17 (internal quotation marks and citation omitted).  DTV seeks to place the risk on the buyer, here Plaintiff, by requiring Plaintiff to prove what would have happened if the warranty had not been made. Under Delaware law, however, the risk is on DTV, the seller.  Thus, contrary to DTV's arguments, Plaintiff has sufficiently proven damages.

\*   \*   \*

Plaintiff has proven that DTV materially breached the Purchase Agreement causing Plaintiff's damages.  Plaintiff is therefore entitled to summary judgment on its breach of contractual warranties claim on the grounds that DTV falsely represented that it did not know of the basis of any FCC investigation into the Station or that it was in compliance with all FCC rules and regulations during the relevant time period.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 3. *DTV's Motion: Breach of "Best Efforts" and "Diligently Prosecute" Provisions*

DTV seeks summary judgment on a different theory of breach—one that, although alleged in the FAC, Plaintiff does not use as the basis for its motion: that DTV breached its obligations to diligently pursue and use its best efforts to obtain FCC Consent.  Three provisions of the Purchase Agreement pertain to the parties' contractual obligations to work to obtain FCC consent: (1) Section 5.1 requires the parties to "diligently prosecute" the assignment application and use "best efforts" to obtain consent as soon as practicable; (2) Section 5.2 requires the parties to "cooperate with the FCC" and "promptly provide all information and documents requested by the FCC"; and (2) Section 9.1 requires the parties to "cooperate fully" with each other and take "any commercially reasonable actions . . . necessary to accomplish the transaction[.]"  (Purchase Agreement §§ 5.1, 5.2, 9.1.)  DTV contends that it is entitled to judgment in its favor on this breach of contract claim because the undisputed facts demonstrate that DTV, through its attorney Peter Tannenwald, used its best efforts to attempt to obtain consent, fully cooperated with the FCC, and took all commercially reasonable action necessary to close the sale.  (*See, e.g.*, Dkt. No. 88-2 ¶¶ 14, 17 (Weigner averring that he and Tannenwald used their best efforts to obtain FCC consent for the assignment); Dkt. No. 88-3 ¶ 2 (Tannenwald averring that he diligently worked to resolve concerns and obtain FCC consent).)

While a reasonable trier of fact could find that DTV satisfied these particular contractual obligations, the trier of fact would not be obligated to do so.  To the contrary, based merely on DTV's delay in submitting any substantive factual response to the FCC regarding the failed inspections until the August 2013 memorandum, a trier of fact could find DTV did not use best efforts and did not cooperate in providing the FCC with information.  Additional evidence, including DTV's counsel's musing that Mr. Weigner was being less than forthcoming about the details of the incident (Dkt. No. 91 ¶¶ 26, 34) further support such a finding.  Similarly, DTV has not submitted undisputed evidence entitling it in effect to a directed verdict on the question of whether it took all "commercially reasonable actions . . . necessary to accomplish the transaction[.]"  (Purchase Agreement § 9.1.)  A factfinder could conclude that DTV could and

22

should have done more and done more sooner; for example, resolving the July 2013 Notice of Apparent Liability earlier instead of waiting until after the termination date to pay the $9,000 forfeiture. (*See* Dkt. No. 96-3 ¶ 8.)  *See supra* n.3.  Thus, DTV's motion for summary judgment on Plaintiff's breach of contract claim to the extent it is premised on Section 5.1, 5.2 and/or 9.1 of the Purchase Agreement must be denied.

**C.      Second Cause of Action: Breach of Implied Covenant of Good Faith and Fair Dealing**

Both parties seek summary judgment on Plaintiff's claim for breach of the implied covenant of good faith and fair dealing.  "Under Delaware law, an implied duty of good faith and fair dealing is interwoven into every contract."  *Anderson v. Wachovia Mortg. Corp.*, 497 F. Supp. 2d 572, 581 (D. Del. 2007) (citing *Chamison v. HealthTrust, Inc.*, 735 A.2d 912, 920 (Del. Ch. 1999), *aff'd*, 748 A.2d 407 (Del. 2000)).  The purpose of implying a covenant of good faith and fair dealing is to "honor the parties' reasonable expectations" under the contract.  *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 447 (Del. 2005).  "This implied covenant is a judicial convention designed to protect the spirit of an agreement when, without violating an express term of an agreement, one side uses oppressive or underhanded tactics[.]"  *TWA Res. v. Complete Prod. Servs., Inc.*, C.A. No. N11C-08-100 MMJ, 2013 WL 1304457, at *6 (Del. Super. Ct. Mar. 28, 2013) (citing *Chamison*, 735 A.2d at 920).  The Delaware Supreme Court

> has recognized the occasional necessity of implying contract terms to ensure the parties' reasonable expectations are fulfilled.  This quasi-reformation, however, should be [a] rare and fact-intensive exercise, governed solely by issues of compelling fairness.  Only when it is clear from the writing that the contracting parties would have agreed to proscribe the act later complained of . . . had they thought to negotiate with respect to that matter may a party invoke the covenant's protections.

*Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 116 (Del. 2006) (alterations in original) (citation omitted).  Generally, courts only infer contract terms "to handle developments or contractual gaps that the asserting party pleads neither party anticipated[,]" not developments that the parties "simply failed to consider[.]"  *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del.2010) (footnotes omitted).  Moreover, Delaware courts "will only imply contract terms when the party asserting the implied covenant proves that the other party has acted arbitrarily or

United States District Court
Northern District of California

United States District Court
Northern District of California

unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonable expected." *Id.* (footnote omitted). Thus, the question is whether there is a gap in the agreement that the implied covenant must fill to achieve the reasonable expectation of the parties. *See TWA Res.*, 2013 WL 1304457, at *9. To prevail on a breach of an implied covenant of good faith and fair dealing, the plaintiff must establish "a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." *Fitzgerald v. Cantor*, Civ. A. No. 16297-NC, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998) (footnote omitted). "[O]ne generally cannot base a claim for breach of the implied covenant on conduct authorized by the agreement." *Nemec*, 991 A.2d at 1125-26 (alteration in original) (footnote omitted).

    1.    *Breach of a Specific Implied Contractual Obligation*

In resolving DTV's motion for judgment on the pleadings, the Court construed Plaintiff's claim as alleging "that DTV took advantage of the termination provision by purposefully delaying its response to the FCC to postpone approval in a bad faith effort to avoid the contract so that it could sell the station for an even higher price." *LocusPoint Networks, LLC*, 2015 WL 2398168, at *5. Thus, the Court reasoned that the specific implied contractual provision is one that states "that the parties agree not to purposefully delay FCC consent[.]" *Id.* In its motion, Plaintiff now clarifies that the implied contractual obligation that serves as the basis of its implied covenant claim is DTV's obligation to refrain from exercising the termination provision of the Purchase Agreement until some reasonable time after the Station is brought into compliance with DTV's contractual warranties—in other words, that DTV cannot terminate until it is in compliance with FCC regulatory requirements in all material respects and there are no more ongoing or open regulatory investigations or proceedings. (*See* Dkt. No. 94 at 22.) Thus, Plaintiff has sufficiently identified the contractual provision on which its claim is based. As there is no provision in the Purchase Agreement that addresses this issue, nor does this provision conflict with any of the existing provisions of the contract, this is the type of provision that falls under the implied covenant. *See TWA Res.*, 2013 WL 1304457, at *9.

To prevail on the claim, Plaintiff must prove that this provision is necessary to address a problem that "neither party anticipated," not developments that the parties "simply failed to

United States District Court
Northern District of California

consider[.]" *Nemec*, 991 A.2d at 1126 (footnote omitted).  Here, the parties certainly considered the possibility that DTV might have had regulatory compliance problems.  To that end, DTV made representations warrantying the absence of any compliance issues, investigations or proceedings in the contract itself.  Plaintiff urges that the FCC investigations and Notices of Apparent Liability must have been a surprise to DTV—that was what was "unexpected" and "unanticipated" and now requires the implied term.  (Dkt. No. 97 at 25.)  It is hard to square this argument with Plaintiff's insistence, elsewhere, that DTV made false statements to the same effect, as required for its breach of contractual warranties and misrepresentation claims.  While a plaintiff can certainly *plead* distinct causes of action in the alternative when their factual underpinnings directly conflict, the plaintiff must choose a path before demanding judgment on both.  This difficulty aside, at least some of the purportedly false warranties or misrepresentations do square with this claim: DTV might not have known of the existence of the investigation, but it still might have known about the facts that could have served as the basis for investigation and compliance proceedings. But as the record does not compel a particular finding, the Court cannot conclude that the implied term Plaintiff proposes addresses a problem that neither party anticipated.  Thus, Plaintiff's motion for summary judgment must be denied.

DTV's motion must likewise be denied.  First, DTV contends that Plaintiff's claim fails because it has not identified a specific contractual obligation it would like to insert into the Purchase Agreement.  (Dkt. No. 88 at 26.)  But Plaintiff plainly has done so.  Moreover, DTV's reliance on *Nemec v. Shrader*, 991 A.2d 1120 (Del. 2010), is misplaced.  In *Nemec*, the implied obligation that the plaintiff urged was expressly permitted under the terms of the parties' contract. *Id.* at 1126.  Not so here: the Purchase Agreement is silent on DTV's obligation to resolve current regulatory compliance investigations before terminating the Purchase Agreement, precisely because it warranted that there were none.  DTV's last argument—that the term Plaintiff proposes frustrates the purpose of the contract—fares no better.  DTV insists that the purpose of the Purchase Agreement was to allow either party to terminate the contract if either believed that the value of the Station had changed significantly by September 1, 2013 and the proposed term directly conflicts.  But DTV ignores the distinction between exercising the termination provision

1    assuming the FCC had not yet granted consent for the assignment due to FCC delay alone, and

2    what happened here, where the FCC had not yet granted consent for the assignment due to

3    ongoing regulatory compliance investigations into the Station that DTV had warranted did not

4    exist.  In short, there remains a triable fact as to whether DTV breached an obligation to refrain

5    from exercising the termination option until after it had resolved ongoing FCC proceedings.

6            As for the existence of damages, Plaintiff again relies on the prevention doctrine.  (*See*

7    Dkt. No. 94 at 21.)  In the context of the implied covenant claim, Delaware courts have allowed

8    the prevention doctrine to establish causation, though normally coupled with evidence of the

9    defendant's bad faith and where the plaintiff had not bargained for the risk that the defendant

10   might have prevented the condition precedent from occurring.  *See W&G Seaford Assocs.*, 714 F.

11   Supp. at 1341; *Mobile Comm'cns Corp. of Am. v. MCI Comm'cns Corp.*, No. 8108, 1985 WL

12   11574, at *4-5 (Del. Ch. Aug. 27, 1985).  Based on the record before the Court, there is a triable

13   issue as to whether DTV actually acted in a bad faith effort to prevent FCC approval before DTV

14   decided whether to exercise the termination option.  The Court therefore declines to grant

15   summary judgment for either party on Plaintiff's claim for breach of the implied covenant of good

16   faith and fair dealing.

17   **D.      Fraudulent and Negligent Misrepresentation and Equitable Estoppel**

18           DTV also moves for summary judgment on Plaintiff's fourth through sixth causes of action

19   for fraud, negligent misrepresentation, and equitable estoppel.  As the Court noted in its Order

20   denying judgment on the pleadings, Plaintiff's claim really sounds in fraudulent inducement—

21   "*i.e.*, that it entered the contract in reliance on DTV's misrepresentations."  *LocusPoint Networks,*

22   *LLC*, 2015 WL 2398168, at *7.  To prevail on a claim for fraud under Delaware law, the plaintiff

23   must prove that (1) Defendant made a false representation or omission; (2) with the relevant level

24   of scienter; (3) with the intent to induce Plaintiff to act or refrain from acting; (4) justifiable

25   reliance; and (5) resulting injury.  *Lord v. Souder*, 748 A.2d 393, 402 (Del. 2000); *ABRY Partners*

26   *V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006).

27           To prove falsity, the Plaintiff must prove that the statement was false when made.  *See H-*

28   *M Wexford LLC*, 832 A.2d at 145-46.  The second element, scienter, is "a mental state embracing

United States District Court
Northern District of California

intent to deceive, manipulate, or defraud." *Deloitte LLP v. Flanagan*, C.A. No. 4125-VCN, 2009 WL 5200657, at *8 (Del. Ch. Dec. 29, 2009) (quotation marks and footnote omitted).  The "relevant level of scienter" for fraudulent misrepresentation is "knowledge or belief that the representation was false, or was made with reckless indifference to the truth[.]"  *Lord*, 748 A.2d at 402.  A reckless statement is one "involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care[.]"  *Deloitte LLP*, 2009 WL 5200657, at *8 (footnote omitted).  The elements of negligent misrepresentation are the same as fraudulent misrepresentation, only the level of scienter differs: to prove scienter for this cause of action, the plaintiff must establish that the defendant had "a particular duty to provide accurate information, based on the plaintiff's pecuniary interest in that information" and that the defendant "fail[ed] to exercise reasonable care in obtaining or communicating information[.]"  *H-M Wexford LLC*, 832 A.2d at 147 n.44 (citation omitted).  "To prove scienter, a plaintiff need not produce direct evidence of the defendant's state of mind . . . [but rather c]ircumstantial evidence may often be the principal, if not the only, means of proving bad faith."  *Deloitte LLP*, 2009 WL 5200657, at *8 (internal quotation marks and footnotes omitted).

Relatedly, to prevail on an equitable estoppel claim, the plaintiff must prove "inequitable conduct by the defendant that led the plaintiff to change its position, in justifiable reliance on that conduct, to its detriment."[11]  *Moore Bus. Forms, Inc. v. Cordant Holdings Corp.*, Civ. A. No. 13911, 1995 WL 662685, at *9 (Del. Ch. Nov. 2, 1995) (citation omitted); *see also Burge v. Fid.*

---

[11] The elements of equitable estoppel have also been listed as follows:

> (1) conduct by the party to be estopped that amounts to a false representation, concealment of material facts, or that is calculated to convey an impression different from, and inconsistent with, that which the party subsequently attempts to assert, (2) knowledge, actual or constructive, of the real facts and the other party's lack of knowledge and the means of discovering the truth, (3) the intention o[r] expectation that the conduct shall be acted upon by, or influence, the other party and good faith reliance by the other, and (4) action or forbearance by the other party amounting to a change in status to his detriment.

*Cornerstone Brands, Inc. v. O'Steen*, No. Civ. A. 1501-N, 2006 WL 2788414, at *3 n.12 (Del. Ch. Sept. 20, 2006).

United States District Court
Northern District of California

*Bond & Mortg. Co.*, 648 A.2d 414, 420 (Del. 1994) ("For an estoppel claim to prevail, it must be shown that the party claiming estoppel lacked knowledge or the means of obtaining knowledge of the truth of the facts in question, relied on the party against whom estoppel is claimed, and suffered a prejudicial change as a result of that reliance.") (citations omitted). The parties agree that the elements of all three claims—fraud, negligent misrepresentation, and equitable estoppel (together, the "misrepresentation" claims)—are the same save the scienter requirement. Accordingly, the Court will address the causes of action together as the parties have.

Here, DTV contends that it is entitled to summary judgment on Plaintiff's fraud, negligent misrepresentation, and estoppel claims because: (1) none of the statements identified were false when made; (2) there is no reasonable reliance; (3) the requisite level of scienter is absent; and (4) lack of resulting injury. Not so. There are genuine disputes of fact on each of these elements.

First, the Court has concluded as a matter of law that DTV's warranties in Sections 7.4 and 7.10 were false when made. *See supra* § B.2.ii.

Second, there is a genuine dispute as to whether DTV disclosed the material facts regarding the alleged FCC violations to Plaintiff notwithstanding what DTV warranted in the Purchase Agreement and therefore regarding Plaintiff's justifiable reliance. *See Homan v. Turoczy*, No. Civ. A. 19220, 2005 WL 2000756, at *17 (Del. Ch. Aug. 12, 2005) (noting that reliance on the misrepresentation is not justified if the plaintiff knew, or had reason to know, that the misrepresentations were false); *see also AES Corp. v. Dow Chem. Co.*, 325 F.3d 174, 178-79 (3d Cir. 2003) (noting that factors in determining whether reliance was reasonable include whether a fiduciary relationship existed between the parties, the sophistication of the plaintiff, the existence of long standing business or personal relationships, and plaintiff's access to the relevant information). Plaintiff has submitted evidence that urges that neither Weigner nor anyone on DTV's behalf disclosed these regulatory compliance issues. (Dkt. No. 92 ¶ 9.) While Plaintiff may be unable to prove that it reasonably relied on the written warranties with respect to certain violations, such as the transmission antenna location violation, the Court declines to parse them for purposes of summary judgment given that Plaintiff's fraud claims involve numerous misrepresentations. Further, Plaintiff has offered evidence that it, in fact, took action or chose to

forebear from taking action in reliance on DTV's misrepresentations by (1) agreeing to enter the Purchase Agreement as written instead of negotiating other protective provisions it would have desired had DTV truthfully disclosed its regulatory violations; and (2) foregoing the opportunity to purchase a different broadcast station in reliance on DTV's representations.  (*See* Dkt. No. 101 ¶ 4; Dkt. No. 100 ¶ 5.)  While a reasonable trier of fact may find that such was not the case, it is enough to present a triable issue as to reliance.

Third, there is also a genuine dispute in the record as to scienter.  For an intentional misrepresentation, Plaintiff must prove that DTV made its false statement with the "knowledge or belief that the representation was false, or was made with reckless indifference to the truth[.]" *Lord*, 748 A.2d at 402; *see also DRR, L.L.C. v. Sears, Roebuck & Co.*, 949 F. Supp. 1132, 1137 (D. Del. 1996) (same) (citation omitted).  Equitable estoppel likewise requires "knowledge, actual or constructive, of the real facts[.]"  *Cornerstone Brands, Inc.*, 2006 WL 2788414, at *3 n.12 (citing *Scott-Douglas Corp. v. Greyhound Corp.*, 304 A.2d 309, 218 (Del. 1973)).  The scienter for negligent misrepresentation is failure to exercise reasonable care in communicating the information.  *H-M Wexford LLC*, 832 A.2d at 147 n.44 (citation omitted).

Here, Weigner's testimony establishes his belief that the FCC was not engaging in an ongoing investigation or proceeding regarding the main studio violations when the FCC did not follow up on the main studio inspection violations in the many months that followed the 2011 visits.  Plaintiff has not offered any testimony or documentary evidence to the contrary.  Thus, it is undisputed that Weigner did not knowingly or intentionally misrepresent that there were no ongoing investigations or proceedings against DTV.  But there are sufficient facts—*i.e.*, the FCC inspectors' visits and DTV's apparent inability to reach the inspectors when Tannenwald tried to respond via email—to present a triable issue as to reckless indifference, and therefore is certainly enough for negligence.

Finally, there is a genuine dispute as to Plaintiff's harm.  *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 32 (Del. Ch. 2009) ("To be actionable, a false statement must cause harm.") (citation omitted).  "[T]he causation requirement under common law fraud and misrepresentation is measured by the relationship between plaintiffs['] reliance and plaintiffs['] loss."  *Lincoln Nat'l*

1    *Life Ins. Co. v. Snyder*, 722 F. Supp. 2d 546, 560 (D. Del. 2010) (footnote omitted).  Put another

2    way,

> The necessary causal connection has two dimensions.  First, the
> false statement must be a factual cause of the harm in the sense that
> the harm would not have occurred but for the false statement.
> Second, the false statement must be a legal cause of the harm,
> meaning that the false statement must be a sufficiently significant
> cause of the harm to impose liability.

7    *NACCO Indus., Inc.*, 997 A.2d at 32 (citation omitted).  For the reasons explained in connection

8    with the breach of contract claim, a reasonable factfinder could, indeed must, conclude that the

9    FCC would have consented to the assignment to Plaintiff but for the regulatory issues that DTV

10   represented did not exist.  DTV is not entitled to summary judgment.

11   **E.     Whether Specific Performance is the Appropriate Remedy**

12          Having determined that Plaintiff is entitled to judgment as a matter of law on its claim that

13   DTV breached sections 7.4(c) and 7.10 of the Purchase Agreement, the Court must now address

14   Plaintiff's contention that it is entitled to specific performance.  Notably, DTV's opposition does

15   not address the propriety of specific performance; DTV insists that Plaintiff cannot prevail on the

16   theory of relief in the first instance, and its opposition fails to argue that a remedy of specific

17   performance is unwarranted in the event that its position on the merits is rejected.  This may be

18   because the parties' agreement prevents DTV from opposing the propriety of specific performance

19   in the event of breach.  (*See* Purchase Agreement § 15.2(b).)  On the other hand, DTV did earlier

20   argue against the availability of specific performance in the context of its motion for judgment on

21   the pleadings.  The Court therefore assumes that DTV maintains this position.

22          Under Delaware law, specific performance is an extraordinary remedy that is only

23   available where the parties are capable of performing under the contract.  *See Osborn ex rel.*

24   *Osborn v. Kemp*, 991 A.2d 1153, 1161 (Del. 2010) ("We will order specific performance only if a

25   party is ready, willing, and able to perform under the terms of the agreement.").  Specifically, a

26   "party seeking specific performance must establish that (1) a valid contract exists, (2) he is ready,

27   willing, and able to perform, and (3) that the balance of equities tips in favor of the party seeking

28   specific performance."  *Id.* at 1158.  The party also must establish by clear and convincing

United States District Court
Northern District of California

1   evidence that there is no adequate remedy at law.  *Id.*  "A party is never entitled to specific

2   performance; the remedy is a matter of grace and not of right, and the appropriateness rests in the

3   sound discretion of the court."  *West Willow-Bay Ct., LLC v. Robino-Bay Ct. Plaza, LLC*, No.

4   C.A. No. 2742-VCN, 2007 WL 3317551, at *13 (Del. Ch. June 19, 2007) (citation omitted).  In

5   short, the question here is whether Plaintiff has established a right to specific performance by clear

6   and convincing evidence.

7        Specific performance is warranted here.  First, it is undisputed that there is a valid contract

8   between the parties.  Second, Plaintiff has established that it is ready, willing, and able to close the

9   transaction.  (Dkt. No. 91 ¶ 37.)  Indeed, to date, Plaintiff has substantially performed all actions

10  short of closing: it paid DTV a signing bonus required by the Purchase Agreement, prepared

11  closing documents, and is ready to pay DTV the remainder of the agreed-upon purchase price.

12  (*Id.* ¶ 36; Dkt. No. 101 ¶ 15.)

13       Turning to the next factor, Plaintiff has demonstrated by clear and convincing evidence

14  that there is no adequate remedy at law.  The Purchase Agreement itself anticipates as much.

15  Section 15 of the Purchase Agreement addresses the available remedies.  That section states that

16  "the Station is a unique asset that cannot be readily replaced on the open market and that Buyer

17  will be irreparably injured if this agreement is breached by Seller."  (Purchase Agreement

18  § 15.2(b).)  That section further provides that, in the event of DTV's breach, Plaintiff may institute

19  an action for specific performance and DTV has no legal right to challenge Plaintiff's right to that

20  remedy.  Specifically, the agreement provides that:

21              Buyer may . . . bring an action for specific performance or injunctive
            relief.  In such event, Buyer shall waive the right to sue Seller for
22          damages.  An action for specific performance or injunctive relief
            shall be a reasonable and satisfactory alternative remedy. . . . [I]n
23          the event that Buyer institutes any action to obtain injunctive relief
            or to specifically enforce Seller's performance under this
24          Agreement, Seller agrees to waive the defense that Buyer has an
            adequate monetary remedy at law and Seller shall not interpose any
25          opposition, legal or otherwise, as to the propriety of specific
            performance or injunctive relief as a remedy for Buyer.
26
    (*Id.* § 15.2(b).)  In short, requiring DTV to honor the Purchase Agreement through specific
27
    performance would be consistent with the bargain that the parties struck.
28

United States District Court
Northern District of California

31

United States District Court
Northern District of California

1   Delaware courts have not squarely addressed the question of whether a contractual

2   agreement to allow specific performance is enough to warrant such an extraordinary remedy.  *See*

3   *Gildor v. Optical Solutions, Inc.*, No. 1416-N, 2006 WL 4782348, at *11 (Del. Ch. June 5, 2006).

4   However, Delaware courts have held that "a contractual stipulation of irreparable harm is

5   sufficient to demonstrate irreparable harm" for the purposes of a request for injunctive relief.  *See*

6   *id.* (collecting cases); *see, e.g.*, *Kansas City So. v. Grupo TMM, S.A.*, No. Civ. A. 20518-NC, 2003

7   WL 22659332, at *5 (Del. Ch. Nov. 4, 2003) (citations omitted); *Cirrus Holding Co. v. Cirrus*

8   *Indus., Inc.*, 794 A.2d 1191, 1209-10 (Del. Ch. 2001); *True No. Commc'ns, Inc. v. Publicis S.A.*,

9   711 A.2d 34, 44 (Del. Ch. 1997), *aff'd*, 705 A.2d 244 (Del. 1997).  As the *Gildor* court explained,

10   a contractual agreement that a breach will cause irreparable harm will be upheld for the purposes

11   of awarding injunctive relief so long as the parties did not include such agreement in the contract

12   as a sham.  2006 WL 4782348, at *11 (footnote omitted).  Thus, "[i]t would create an odd kink in

13   Delaware law . . . to determine that parties are permitted to stipulate by contract that a breach will

14   give rise to irreparable harm but not to stipulate that an aggrieved party may obtain specific

15   performance as a remedy for breach."  *Id.*  Following this logic, the Delaware Court of Chancery

16   found the injunctive relief irreparable harm analysis applicable to requests to enforce contractual

17   agreements to allow for a remedy of specific performance—that is, if the parties' contractually

18   agreed that specific performance was appropriate, that agreement should be upheld by awarding

19   specific performance.  *Gildor*, 2006 WL 4782348, at *11 ("Although this court has not had the

20   prior opportunity to determine whether a contractual provision granting an aggrieved party a

21   contractual right of specific performance is enforceable, Delaware courts do not lightly trump the

22   freedom to contract and, in the absence of some countervailing public policy interest, courts

23   should respect the parties' bargain.") (footnotes omitted).

24   Here, Plaintiff has proffered evidence that the Station is a unique asset, which indicates

25   that the contractual provision naming it as such was not a sham.  For example, one of Plaintiff's

26   co-founders, William DeKay, avers that "part of [Plaintiff's] strategic plan was to manage

27   portfolio risk by acquiring stations in as many critical markets as possible" to "reduce its overall

28   risk that a given market will not be as profitable as expected."  (Dkt. No. 93 ¶ 8.)  Thus, when the

parties signed the Purchase Agreement to acquire the Station, Plaintiff "stopped working in Philadelphia" and moved on to focus on other markets. (*Id.*)  Mr. DeKay further asserts that a Philadelphia station was of particular importance due to its location in the Northeast Corridor between Washington, DC and New York, and accordingly, its ability to block use of TV spectrum in both of those markets. (*Id.* ¶ 9.)  What is more, having a Philadelphia station allows Plaintiff to offer providers and advertisers a "network of stations" that covers "major cities[,]" which is more valuable. (*Id.* ¶ 10.)  Further, WPHA is unique to Plaintiff given that Plaintiff's Engineering Manager is located in Atlantic City, which makes the Station more profitable for Plaintiff to operate than others. (*Id.* ¶ 11.)  In its opposition, DTV does not offer facts to contradict these points, and the Court therefore accepts them as true.  Plaintiff has therefore established that the Station is a unique asset, which indicates that the parties' contractual stipulation that the Station was a unique asset controls, and accordingly there is no adequate remedy at law.  *See Lineberger v. Welsh*, 290 A.2d 847, 848 (1972).

Specific performance is also appropriate where, as here, the remedy at law—*i.e.*, money damages—would be difficult to calculate.  *See In re IBP, Inc. Shareholders Litig.*, 789 A.2d 14, 83 (Del. Ch. 2001).  Putting aside the unique aspects of the Station that would render monetary damages insufficient in the first instance, determining the appropriate amount here would be guesswork.  Under Delaware law, a party suing for breach of contract is entitled to expectation damages, which are "measured by the amount of money that would put the promise in the same position as if the promisor had performed the contract." *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001).  "Expectation damages thus require the breaching promisor to compensate the promise for the promisee's reasonable expectation of the value of the breached contract, and, hence, what the promise lost." *Id.*  Here, Plaintiff lost the value of taking the Station to sale at the FCC spectrum auction.  The Station's auction price remains unknown.  The parties appear to agree that the price is subject to fluctuation with the market.  In similar circumstances, Delaware courts have found specific performance more appropriate than a speculative determination of the future value of goods at auction.  *See, e.g.*, *In re IBP, Inc. Shareholders Litig.*, 789 A.2d at 83 (awarding specific performance where "determination of a cash damages award will be very difficult"

United States District Court
Northern District of California

1   because the parties would "haggle over huge valuation questions" involving "the possibility of a

2   further auction" for the goods or other business developments). So it is here. For each of these

3   reasons, Plaintiff has met its burden of establishing by clear and convincing evidence that there is

4   no adequate remedy at law, which weighs in favor of granting specific performance.

5   Next, the balance of the equities likewise tips in favor of granting specific performance.

6   When balancing the equities, courts "must be convinced that specific enforcement of a validly

7   formed contract would [not] cause even greater harm than it would prevent." *Osborn*, 991 A.2d at

8   1161 (internal quotation marks and citations omitted). While, as noted above, DTV did not

9   address the propriety of specific performance in its opposition, DTV repeatedly makes an

10  argument that, in essence, boils down to a balancing of the equities: that it is fair to allow DTV to

11  keep the station and take it to auction itself because the parties' contract contemplated that the

12  market value of the Station would fluctuate. In short, DTV urges that because the value of the

13  Station has gone up, specific performance should be denied. But Delaware courts have long held

14  that, at least in the context of real property purchase agreements, the mere increase in value, absent

15  other circumstances showing inequity, is does not justify a denial of specific performance. *Id.*

16  (citing *Cunningham v. Esso Standard Oil Co.*, 118 A.2d 611, 614 (Del. 1955)). DTV does not

17  identify other circumstances showing inequity here.

18  Finally, in determining whether to exercise its discretion to grant specific performance, the

19  Court returns to an argument DTV made in the context of its motion for judgment on the pleadings

20  that specific performance is not warranted here because DTV's performance on the contract is

21  conditioned on consent for the sale that is outside of DTV's control. *See LocusPoint Networks,*

22  *LLC*, 2015 WL 2398168, at *4. Indeed, in *Charlotte Broadcasting, LLC v. Davis Broadcasting of*

23  *Atlanta LLC*, No. C.A. 7793-VCG, 2013 WL 1405509, at *6 (Del. Ch. Jan. 3, 2013), and *West*

24  *Willow-Bay Ct., LLC v. Robino-Bay Ct. Plaza, LLC*, No. C.A. No. 2742-VCN, 2007 WL 3317551,

25  at *13 (Del. Ch. June 19, 2007), Delaware courts found specific performance of a contract for sale

26  unavailable either because the actions of a third party made obtaining consent for the sale unlikely

27  or altogether outside of the buyer's control. Not so here. By DTV's own admissions, the only

28  impediment to the FCC's consent are the outstanding Notices of Apparent Liability facing DTV,

34

United States District Court
Northern District of California

and the FCC will grant consent for the assignment as soon as DTV resolves the NAL.  (*See, e.g.*, Dkt. No. 91-1 at 17 (Tannenwald writes that the FCC "is ready to approve the sale once the [Notice of Apparent Liability] has been issued"); *id.* at 15 ("When the NAL comes out, the assignment of license will be granted . . . conditioned on [DTV] paying the NAL[.]").)  Having admitted as much, DTV cannot now be heard to say that obtaining consent from the FCC is out of its control.  To the contrary, these admissions provide further support for specific performance.

Accordingly, Plaintiff is entitled to specific performance to remedy DTV's breach, just as the parties' Purchase Agreement provides.  While the Court cannot and will not order the third party—*i.e.*, the FCC—to provide consent for the assignment, it will order DTV to specifically perform its obligations under the Purchase Agreement.  The prevention doctrine mandates that DTV cannot terminate the Purchase Agreement while its own conduct is responsible for delaying FCC consent.  *See, e.g.*, *WaveDivision*, 2010 WL 3706624, at *14.  Because there is no genuine dispute that DTV's false warranties caused the FCC to delay granting consent to the assignment, DTV may not exercise its termination option in Section 15.1 of the Purchase Agreement.  Instead, DTV is ordered to take steps to resolve the pending investigation and government enforcement proceedings into the Station.  Once the FCC grants consent, the parties shall proceed to closing, with DTV selling the Station to Plaintiff at the agreed-upon purchase price.

## CONCLUSION

For the reasons discussed above, the Court GRANTS IN PART Plaintiff's motion for summary judgment and DENIES DTV's motion for summary judgment.  Specifically, the Court enters judgment in Plaintiff's favor on the breach of contract claim for breach of certain contractual warranties and concludes that Plaintiff is entitled to an order awarding DTV's specific performance of the Purchase Agreement.  Summary judgment as to all other causes of action is denied.  The parties are directed to appear for a further case management conference on September 10, 2015 at 1:30 p.m.  They shall submit a further case management conference statement on or before September 8, 2015 that addresses how the case should proceed in light of this Order.

This Order disposes of Docket Nos. 88 and 94.

**IT IS SO ORDERED.**

Dated: August 25, 2015

_____
JACQUELINE SCOTT CORLEY
United States Magistrate Judge

United States District Court
Northern District of California